## NORRIS *v.* ALABAMA.

No. 534.   Argued February 15, 18, 1935.—Decided April 1, 1935.

*Mr. Samuel S. Leibowitz* for petitioner.

*Mr. Thomas E. Knight, Jr.,* Attorney General of Alabama, with whom *Mr. Thomas Seay Lawson,* Assistant Attorney General, was on the brief, for respondent.

Mr. Chief Justice Hughes delivered the opinion of the Court.

Petitioner, Clarence Norris, is one of nine negro boys who were indicted in March, 1931, in Jackson County, Alabama, for the crime of rape. On being brought to trial in that county, eight were convicted. The Supreme Court of Alabama reversed the conviction of one of these and affirmed that of seven, including Norris. This Court reversed the judgments of conviction upon the ground that the defendants had been denied due process of law in that the trial court had failed in the light of the circumstances disclosed, and of the inability of the defendants at that time to obtain counsel, to make an effective appointment of counsel to aid them in preparing and presenting their defense. *Powell* v. *Alabama,* 287 U. S. 45.

After the remand, a motion for change of venue was granted and the cases were transferred to Morgan County. Norris was brought to trial in November, 1933. At the outset, a motion was made on his behalf to quash the indictment upon the ground of the exclusion of negroes from juries in Jackson County where the indictment was found. A motion was also made to quash the trial *venire* in Morgan County upon the ground of the exclusion of negroes from juries in that county. In relation to each county, the charge was of long continued, systematic and arbitrary exclusion of qualified negro citizens from service on juries, solely because of their race and color, in violation of the Constitution of the United States. The State joined issue on this charge and after hearing the evidence, which we shall presently review, the trial judge denied both motions, and exception was taken. The trial then proceeded and resulted in the conviction of Norris who was sentenced to death. On appeal, the Supreme Court of the State considered and decided the federal question

which Norris had raised, and affirmed the judgment. 229 Ala. 226; 156 So. 556. We granted a writ of certiorari. 293 U. S. 552.

*First.* There is no controversy as to the constitutional principle involved. That principle, long since declared, was not challenged, but was expressly recognized, by the Supreme Court of the State. Summing up precisely the effect of earlier decisions, this Court thus stated the principle in *Carter* v. *Texas*, 177 U. S. 442, 447, in relation to exclusion from service on grand juries: "Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. *Strauder* v. *West Virginia*, 100 U. S. 303; *Neal* v. *Delaware*, 103 U. S. 370, 397; *Gibson* v. *Mississippi*, 162 U. S. 565." This statement was repeated in the same terms in *Rogers* v. *Alabama*, 192 U. S. 226, 231, and again in *Martin* v. *Texas*, 200 U. S. 316, 319. The principle is equally applicable to a similar exclusion of negroes from service on petit juries. *Strauder* v. *West Virginia, supra; Martin* v. *Texas, supra.* And although the state statute defining the qualifications of jurors may be fair on its face, the constitutional provision affords protection against action of the State through its administrative officers in effecting the prohibited discrimination. *Neal* v. *Delaware, supra; Carter* v. *Texas, supra.* Compare *Virginia* v. *Rives*, 100 U. S 313, 322, 323; *In re Wood*, 140 U. S. 278, 285; *Thomas* v. *Texas*, 212 U. S. 278, 282, 283.

The question is of the application of this established principle to the facts disclosed by the record. That the question is one of fact does not relieve us of the duty to

determine whether in truth a federal right has been denied. When a federal right has been specially set up and claimed in a state court, it is our province to inquire not merely whether it was denied in express terms but also whether it was denied in substance and effect. If this requires an examination of evidence, that examination must be made. Otherwise, review by this Court would fail of its purpose in safeguarding constitutional rights. Thus, whenever a conclusion of law of a state court as to a federal right and findings of fact are so intermingled that the latter control the former, it is incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured. *Creswill* v. *Knights of Pythias,* 225 U. S. 246, 261; *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585, 593; *Ward* v. *Love County,* 253 U. S. 17, 22; *Davis* v. *Wechsler,* 263 U. S. 22, 24; *Fiske* v. *Kansas,* 274 U. S. 380, 385, 386; *Ancient Egyptian Order* v. *Michaux,* 279 U. S. 737, 745.

*Second. The evidence on the motion to quash the indictment.* In 1930, the total population of Jackson County, where the indictment was found, was 36,881, of whom 2688 were negroes. The male population over twenty-one years of age numbered 8801, and of these, 666 were negroes.

The qualifications of jurors were thus prescribed by the state statute (Alabama Code, 1923, § 8603): "The jury commission shall place on the jury roll and in the jury box the names of all male citizens of the county who are generally reputed to be honest and intelligent men, and are esteemed in the community for their integrity, good character and sound judgment, but no person must be selected who is under twenty-one or over sixty-five years of age, or, who is an habitual drunkard, or who, being afflicted with a permanent disease or physical weakness is unfit to discharge the duties of a juror, or who cannot

read English, or who has ever been convicted of any offense involving moral turpitude. If a person cannot read English and has all the other qualifications prescribed herein and is a freeholder or householder, his name may be placed on the jury roll and in the jury box." See Gen. Acts, Alabama, 1931, No. 47, p. 59.

Defendant adduced evidence to support the charge of unconstitutional discrimination in the actual administration of the statute in Jackson County. The testimony, as the state court said, tended to show that " in a long number of years no negro had been called for jury service in that county." It appeared that no negro had served on any grand or petit jury in that county within the memory of witnesses who had lived there all their lives. Testimony to that effect was given by men whose ages ran from fifty to seventy-six years. Their testimony was uncontradicted. It was supported by the testimony of officials. The clerk of the jury commission and the clerk of the circuit court had never known of a negro serving on a grand jury in Jackson County. The court reporter, who had not missed a session in that county in twenty-four years, and two jury commissioners testified to the same effect. One of the latter, who was a member of the commission which made up the jury roll for the grand jury which found the indictment, testified that he had " never known of a single instance where any negro sat on any grand or petit jury in the entire history of that county."

That testimony in itself made out a *prima facie* case of the denial of the equal protection which the Constitution guarantees. See *Neal* v. *Delaware, supra*. The case thus made was supplemented by direct testimony that specified negroes, thirty or more in number, were qualified for jury service. Among these were negroes who were members of school boards, or trustees, of colored schools, and property owners and householders. It also appeared that

negroes from that county had been called for jury service in the federal court. Several of those who were thus described as qualified were witnesses. While there was testimony which cast doubt upon the qualifications of some of the negroes who had been named, and there was also general testimony by the editor of a local newspaper who gave his opinion as to the lack of " sound judgment " of the " good negroes " in Jackson County, we think that the definite testimony as to the actual qualifications of individual negroes, which was not met by any testimony equally direct, showed that there were negroes in Jackson County qualified for jury service.

The question arose whether names of negroes were in fact on the jury roll. The books containing the jury roll for Jackson County for the year 1930–31 were produced. They were produced from the custody of a member of the jury commission which, in 1931, had succeeded the commission which had made up the jury roll from which the grand jury in question had been drawn. On the pages of this roll appeared the names of six negroes. They were entered, respectively, at the end of the precinct lists which were alphabetically arranged. The genuineness of these entries was disputed. It appeared that after the jury roll in question had been made up, and after the new jury commission had taken office, one of the new commissioners directed the new clerk to draw lines after the names which had been placed on the roll by the preceding commission. These lines, on the pages under consideration, were red lines, and the clerk of the old commission testified that they were not put in by him. The entries made by the new clerk, for the new jury roll, were below these lines.

The names of the six negroes were in each instance written immediately above the red lines. An expert of long experience testified that these names were superim-

posed upon the red lines, that is, that they were written after the lines had been drawn. The expert was not cross-examined and no testimony was introduced to contradict him.[1] In denying the motion to quash, the trial judge expressed the view that he would not " be authorized to presume that somebody had committed a crime " or to presume that the jury board " had been unfaithful to their duties and allowed the books to be tampered with." His conclusion was that names of negroes were on the jury roll.

We think that the evidence did not justify that conclusion. The Supreme Court of the State did not sustain it. That court observed that the charge that the names of negroes were fraudulently placed on the roll did not involve any member of the jury board, and that the charge " was, by implication at least, laid at the door of the clerk of the board." The court, reaching its decision irrespective of that question, treated that phase of the matter as " wholly immaterial " and hence passed it by " without any expression of opinion thereon."

The state court rested its decision upon the ground that even if it were assumed that there was no name of a negro on the jury roll, it was not established that race or color caused the omission. The court pointed out that the statute fixed a high standard of qualifications for jurors (*Green* v. *State*, 73 Ala. 26; *State* v. *Curtis*, 210 Ala. 1; 97 So. 291) and that the jury commission was vested with a wide discretion. The court adverted to the fact that more white citizens possessing age qualifications had been omitted from the jury roll than the entire negro population of the county, and regarded the testimony as being to the effect that " the matter of race, color, politics, religion or fraternal affiliations " had not been discussed by

---

[1] The books containing the jury roll in question were produced on the argument at this bar and were examined by the Court.

the commission and had not entered into their consideration, and that no one had been excluded because of race or color.

The testimony showed the practice of the jury commission. One of the commissioners who made up the jury roll in question, and the clerk of that commission, testified as to the manner of its preparation. The other two commissioners of that period did not testify. It was shown that the clerk, under the direction of the commissioners, made up a preliminary list which was based on the registration list of voters, the polling list and the tax list, and apparently also upon the telephone directory. The clerk testified that he made up a list of all male citizens between the ages of twenty-one and sixty-five years without regard to their status or qualifications. The commissioner testified that the designation " col." was placed after the names of those who were colored. In preparing the final jury roll, the preliminary list was checked off as to qualified jurors with the aid of men whom the commissioners called in for that purpose from the different precincts. And the commissioner testified that in the selections for the jury roll no one was " automatically or systematically " excluded, or excluded on account of race or color; that he " did not inquire as to color, that was not discussed."

But, in appraising the action of the commissioners, these statements cannot be divorced from other testimony. As we have seen, there was testimony, not overborne or discredited, that there were in fact negroes in the county qualified for jury service. That testimony was direct and specific. After eliminating those persons as to whom there was some evidence of lack of qualifications, a considerable number of others remained. The fact that the testimony as to these persons, fully identified, was not challenged by evidence appropriately direct, cannot be

brushed aside. There is no ground for an assumption that the names of these negroes were not on the preliminary list. The inference to be drawn from the testimony is that they were on that preliminary list, and were designated on that list as the names of negroes, and that they were not placed on the jury roll. There was thus presented a test of the practice of the commissioners. Something more than mere general asseverations was required. Why were these names excluded from the jury roll? Was it because of the lack of statutory qualifications? Were the qualifications of negroes actually and properly considered?

The testimony of the commissioner on this crucial question puts the case in a strong light. That testimony leads to the conclusion that these or other negroes were not excluded on account of age, or lack of esteem in the community for integrity and judgment, or because of disease or want of any other qualification. The commissioner's answer to specific inquiry upon this point was that negroes were "never discussed." We give in the margin quotations from his testimony.[2]

---

[2] " Q. Did you ever exclude from the jury rolls any negroes because you found first, he was a man under twenty-one years old or over sixty-five, and he was excluded by reason of his age; secondly because he was a person who wasn't esteemed in the community for being a decent and honorable citizen, for good sound common sense and judgment, did you ever see or hear of them not going to take that negro because he wasn't esteemed in the community for good sense and judgment? A. No, sir.

" Q. Did you ever have occasion to say, I can't take that negro because he is a fellow that has a disease which may affect or does affect, his mentality, did you ever say that to yourself, with reference to any particular negro? A. No, sir, negroes was never discussed.

" Q. Did you ever say to yourself as a jury commissioner in compiling those lists, I am not going to take that negro because he has been convicted before of a crime involving moral turpitude, have you ever excluded a negro on that ground, did you ever find any negro

We are of the opinion that the evidence required a different result from that reached in the state court. We think that the evidence that for a generation or longer no negro had been called for service on any jury in Jackson County, that there were negroes qualified for jury service, that according to the practice of the jury commission their names would normally appear on the preliminary list of male citizens of the requisite age but that no names of negroes were placed on the jury roll, and the testimony with respect to the lack of appropriate consideration of the qualifications of negroes, established the discrimination which the Constitution forbids. The motion to quash the indictment upon that ground should have been granted.

*Third.* *The evidence on the motion to quash the trial venire.* The population of Morgan County, where the trial was had, was larger than that of Jackson County, and the proportion of negroes was much greater. The total population of Morgan County in 1930 was 46,176, and of this number 8,311 were negroes.

Within the memory of witnesses, long resident there, no negro had ever served on a jury in that county or had been called for such service. Some of these witnesses were over fifty years of age and had always lived in Mor-

---

that came within that category, under your personal knowledge in Jackson County? A. I couldn't recall any, no, sir, I don't know.

" Q. Have you ever known of any negro in Jackson County who was excluded by reason of the fact that he could not read English, and that negro at the same time wasn't a free holder or house holder, did you ever say I can't take that negro because he is prohibited under the rules from serving by reason of that provision? A. No, sir.

" Q. Or anybody in your presence? A. It never was discussed.

" Q. You had been a jury commissioner how long? A. I was on it under Bibb Graves administration, 1928, 1929, 1930.

" Q. Three years? A. Yes, sir.

" Q. And you never had occasion to exclude any negro in Jackson County by reason of the disqualifying provisions I have just called to your attention? A. Not to my personal knowledge, no, sir."

gan County. Their testimony was not contradicted. A clerk of the circuit court, who had resided in the county for thirty years, and who had been in office for over four years, testified that during his official term approximately 2500 persons had been called for jury service and that not one of them was a negro; that he did not recall "ever seeing any single person of the colored race serve on any jury in Morgan County."

There was abundant evidence that there were a large number of negroes in the county who were qualified for jury service. Men of intelligence, some of whom were college graduates, testified to long lists (said to contain nearly 200 names) of such qualified negroes, including many business men, owners of real property and householders. When defendant's counsel proposed to call many additional witnesses in order to adduce further proof of qualifications of negroes for jury service, the trial judge limited the testimony, holding that the evidence was cumulative.

We find no warrant for a conclusion that the names of any of the negroes as to whom this testimony was given, or of any other negroes, were placed on the jury rolls. No such names were identified. The evidence that for many years no negro had been called for jury service itself tended to show the absence of the names of negroes from the jury rolls, and the State made no effort to prove their presence. The trial judge limited the defendant's proof "to the present year, the present jury roll." The sheriff of the county, called as a witness for defendants, scanned the jury roll and after "looking over every single name on that jury roll, from A to Z," was unable to point out "any single negro on it."

For this long-continued, unvarying, and wholesale exclusion of negroes from jury service we find no justification consistent with the constitutional mandate. We have carefully examined the testimony of the jury commissioners upon which the state court based its decision. One

of these commissioners testified in person and the other two submitted brief affidavits. By the state act (Gen. Acts, Ala., 1931, No. 47, p. 55), in force at the time the jury roll in question was made up, the clerk of the jury board was required to obtain the names of all male citizens of the county over twenty-one and under sixty-five years of age, and their occupation, place of residence and place of business. (*Id.*, p. 58, § 11.) The qualifications of those who were to be placed on the jury roll were the same as those prescribed by the earlier statute which we have already quoted. (*Id.*, p. 59, § 14.) The member of the jury board, who testified orally, said that a list was made up which included the names of all male citizens of suitable age; that black residents were not excluded from this general list; that in compiling the jury roll he did not consider race or color; that no one was excluded for that reason; and that he had placed on the jury roll the names of persons possessing the qualifications under the statute. The affidavits of the other members of the board contained general statements to the same effect.

We think that this evidence failed to rebut the strong *prima facie* case which defendant had made. That showing as to the long-continued exclusion of negroes from jury service, and as to the many negroes qualified for that service, could not be met by mere generalities. If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the constitutional provision—adopted with special reference to their protection—would be but a vain and illusory requirement. The general attitude of the jury commissioner is shown by the following extract from his testimony: " I do not know of any negro in Morgan County over twenty-one and under sixty-five who is generally reputed to be honest and intelligent and who is esteemed in the community for his integrity, good char-

acter and sound judgment, who is not an habitual drunkard, who isn't afflicted with a permanent disease or physical weakness which would render him unfit to discharge the duties of a juror, and who can read English, and who has never been convicted of a crime involving moral turpitude." In the light of the testimony given by defendant's witnesses, we find it impossible ·to accept such a sweeping characterization of the lack of qualifications of negroes in Morgan County. It is so sweeping, and so contrary to the evidence as to the many qualified negroes, that it destroys the intended effect of the commissioner's testimony.

In *Neal* v. *Delaware, supra,* decided over fifty years ago, this Court observed that it was a " violent presumption," in which the state court had there indulged, that the uniform exclusion of negroes from juries, during a period of many years, was solely because, in the judgment of the officers, charged with the selection of grand and petit jurors, fairly exercised, " the black race in Delaware were utterly disqualified by want of intelligence, experience, or moral integrity, to sit on juries." Such a presumption at the present time would be no less violent with respect to the exclusion of the negroes of Morgan County. And, upon the proof contained in the record now before us, a conclusion that their continuous and total exclusion from juries was because there were none possessing the requisite qualifications, cannot be sustained.

We are concerned only with the federal question which we have discussed, and in view of the denial of the federal right suitably asserted, the judgment must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE McREYNOLDS did not hear the argument and took no part in the consideration and decision of this case.