Fuld, J.
Charged by an information with selling and distributing an allegedly obscene magazine in violation of section 1141 of the Penal Law, the defendant Richmond County News, Inc., was convicted in the Court of Special Sessions of the City of New York. Upon appeal, the conviction was reversed and the information dismissed; although the Appellate Division agreed with the trial court that the magazine was obscene, it decided that the proof failed to establish that the defendant had knowledge of the magazine’s obscene character.
*580 We believe that the reversal was required, but for a different reason. It is our view that the magazine is not obscene and, accordingly, we do not reach the question as to the kind of knowledge required for a conviction under this statute or the question whether the evidence would justify a finding that such knowledge existed.
The defendant is a wholesaler of magazines, paper-covered books and newspapers. Among the 700-odd items carried by the defendant, which it receives from national distributors, was the magazine ‘[1] Gent ’ ’, and it was the sale and distribution of its April,- 1957 issue which occasioned the prosecution under section 1141.
The photocover of ‘ ‘ Gent ’ ’ is similar to that of numerous other magazines which loudly proclaim their dedication to coarse sensuality. The contents, like the cover, exhibit the same attempt to pander to and commercialize upon man’s taste for the bawdy and the ribald behind a bare disguise of aesthetic respectability. Thus, together with short stories of apparent literary merit, reprinted with permission from standard editions of the authors’ works, which are inoffensive under any standard of sexual sensitivity, there appear the usual staples of this form of sexual provocation, including “ artistic ” photographs, salacious cartoons and short stories of sexual seduction.
The courts below have characterized the magazine as 1 ‘ obscene ’ ’, but whether that finding is justified requires us — despite contrary intimations in some of our decisions (see People v. Pesky, 254 N. Y. 373; People v. Muller, 96 N. Y. 408, 410) — to make an independent constitutional appraisal of the magazine. This court, as the State’s highest tribunal, no less than the United States Supreme Court, cannot escape its responsibility in this area ‘1 by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as ‘ obscene, ’ for, if ‘ obscenity ’ is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional judgment of the most sensitive and delicate kind.” (Roth v. United States, 354 U. S. 476, 497-498 [Harlan, J., concurring]; see, also, Feiner v. New York, 340 U. S. 315, 316; Watts v. Indiana, 338 U. S. 49, 51; Norris v. Alabama, 294 U. S. 587, 589-590; Lockhart and McClure, Censorship of Obscenity: The Developing *581 Constitutional Standards, 45 Minn. L. Rev. 5, 114-120.) It involves not a simple question of fact, but a mixed question of fact and constitutional law, calling upon the court to make an appraisal of a publication and its contents against the requirements embodied in both State and Federal Constitutions (N. Y. Const., art. I, § 8; U. S. Const., 1st and 14th Arndts.). Consequently, if an appellate court were to rely upon and be bound by the opinion of the trier of the facts as to the obscenity of a publication it would be abdicating its role as an arbiter of constitutional issues.
It is settled doctrine that a state may constitutionally convict those who publish, sell or keep for sale publications “ incontestably found to be obscene” without offending against the guarantees of the First Amendment. (Kingsley Books v. Brown, 354 U. S. 436, 440; Roth v. United States, 354 U. S. 476, 481, supra: Alberts v. California, 354 U. S. 476.) But the existence of the State’s power to prevent the distribution of obscene matter “ does not mean that there can be no constitutional barrier to any form of practical exercise of that power”. (Smith v. California, 361 U. S. 147, 155; see, also, Roth v. United States, 354 U. S. 476, 497-498, supra, Harlan, J., concurring.) Although the Constitution does not, therefore, stand as a barrier against legislation making obscenity criminal, it does stand as a limitation on such legislation of such a sort as to compel us to construe it strictly. The danger of a violation of cherished First Amendment rights necessitates narrow construction; we may open ‘ ‘ the door barring federal and state intrusion into this area * * * only the slightest crack necessary ”. (Roth v. United States, 354 U. S. 476, 488, supra.)
Whether we focus upon the historical development of social and judicial attitudes towards writings or art work dealing with sex, or whether we view the differences on this score among various groups within our contemporary society, we cannot help but be impressed by the extraordinary diversity which is manifest.[1] Under these circumstances, we must interpret our *582 statute to include only those prohibitions which find the widest acceptance, and which reflect the most universal moral sensibilities. “ The law”, said Judge Cabdozo, “.will not hold the crowd to the morality of saints and seers ” (Paradoxes of Legal Science, p. 37); nor, we would add, will it hold the crowd to the literary or artistic fashion of the hour.
An interest in upholding the legislation also demands that its impact be limited to its legitimate sphere, so that it will not be held applicable to the advocacy of ideas. The urging of doctrine, for instance, even if mischief would result were it followed, is within the protection of the Constitution. (See Yates v. United States, 354 U. S. 298, 318, 322; Dennis v. United States, 341 U. S. 494, 512-513.) And the mere fact that adulterous or other sexually immoral relationships are portrayed approvingly cannot serve as a reason for declaring a work obscene without running afoul of the First Amendment. (See Kingsley Pictures Corp. v. Regents, 360 U. S. 684, 688.) The Constitution protects ‘ ‘ advocacy of the opinion that adultery may sometimes be proper, no less than advocacy of socialism or the single tax” (Kingsley Pictures Corp. v. Regents, 360 U. S., at p. 689).
The same protection applies even if the material which is subject to prohibition is a form of entertainment, rather than an exposition of ideas, and even if we conclude that it is lacking in all social value. (See Winters v. New York, 333 U. S. 507, 510; Hannegan v. Esquire, Inc., 327 U. S. 146, 153, 158.) As the Supreme Court observed in the Winters case (333 U. S., at p. 510), “ What is one man’s amusement, teaches another’s doctrine. Though we can see nothing of any possible value to society in these magazines, they are as much entitled to the protection of free speech as the best of literature.”
It is noteworthy that, despite the reams of material on the effect of books, magazines and other media of expression on sexual conduct,[2] “ there is [very] little scientific evidence ” on *583 the subject. (St. John-Stevas, Obscenity and the Law [1956], p. 196; see, also, Brown v. Kingsley Books, 1 N Y 2d 177, 181, n. 3 [affd. sub nom. Kingsley Books v. Brown, 354 U. S. 436]; United. States v. Roth, 237 F. 2d 796, 812-817, per Frank, J., concurring [affd. sub nom. Roth v. United States, 354 U. S. 476, supra].) Indeed, two authoritative writers in the field have concluded that, “ Although the whole subject of obscenity censorship hinges upon the unproved assumption that ‘ obscene ’ literature is a significant factor in causing sexual deviation from the community standard, no report can be found of a single effort at genuine research to test this assumption by singling out as a factor for study the effect of sex literature upon sexual behaviour ”. (Lockhart and McClure, Obscenity in the Courts, 20 Law and Contemporary Problems 587, 595; see, also, American Law Institute, Model Penal Code, Tentative Draft No. 6, § 207.10, p. 44.) Some commentators have gone even further and suggested that ‘1 for an undetermined number of individuals, the writing or reading of obscenity may be a substitute for rather than a stimulus to physical sexuality.” (American Law Institute, Model Penal Code, Tentative Draft No. 6, § 207.10, p. 24.)
Other writers, expressing a somewhat different view, argue that the obscenity laws themselves, in forbidding the publication, sale and distribution of obscenity, can have little effect on sexual crime or other anti-social conduct. Some studies seem to suggest that ‘ ‘ erotic responses ’ whether normal or abnormal, are as frequently evoked by objects and literature which are not, in the conventional sense, sexual as by the conventional sexual stimuli. (See Kinsey et al., Sexual Behavior in the Human Female [1953], pp. 669-670; Kinsey et al., Sexual Behavior in the Human Male [1948], p. 510.) And a survey made some years ago by the New York City Bureau of Social Hygiene showed that out of 409 college women who responded to the question inquiring what they found most sexually stimulating, 18 said “ pictures ”, 40 said “ drama ”, 95 said “ books ”, and *584 218 simply said “man”. (See Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40, 73.)
The argument on this score was incomparably stated some centuries ago by Milton in his immortal “ Areopagitica ”: ‘1 They are not skilful considerers of human things, who imagine to remove sin by removing the matter of sin * * * Though ye take from a covetous man all his treasure, he has yet one jewel left, ye can not bereave him of his covetousness. Banish all objects of lust, shut up all youth into the severest discipline that can be exercised in any hermitage, ye can not make them chaste, that came not thither so ”.
In alluding to these commentaries and studies which reflect upon the wisdom and validity of obscenity laws, we do not, of course, mean to approve their conclusions or to suggest that they provide a basis for overturning the statute before us. Even if all these materials were in agreement — and, as we have seen, they are not — this court alone would still have the sole authority and duty of performing the judicial function involved in the interpretation and application of a state statute. However, although the views of expert laymen 'cannot possibly impeach the legal validity of the statute, their writings do reflect responsible views in the social community which any forward-looking court ought to take into account.
The broader the prohibitions we read into our statute, the more unlikely it is that these prohibitions are reasonably related to the legitimate ends which the legislation seeks to serve. Thus, the constitutional background of the legislation, the inherent nature of the subject of regulation and the available knowledge concerning the possible effects of such legal regulation all point to and necessitate a very limited definition of the statutory prohibition of obscenity.
Turning now to the problem of definition itself, we note, to begin with, that, until very recently, the test of obscenity in this State was that laid down in Regina v. Hicklin (L. R. 3 Q. B. 360 [1868]) and stated by this court to be “ whether the tendency of the matter charged as obscenity is to deprave or corrupt those whose minds are open to such immoral influences, and who might come into contact with it ”. (People v. Muller, 96 N. Y. 408, 411, supra; see, also, People v. Doubleday & Co., 297 N. Y. 687, affd. 335 U. S. 848.) This test was justly criticized, *585 however, on two different grounds — the first, that, as applied, a book might be condemned on the basis of isolated passages in it rather than because of its “dominant effect ” (United States v. One Book Entitled Ulysses, 72 F. 2d 705, 708, affg. 5 F. Supp. 182, 185) and the second, that it “ reduce[d] our treatment of sex to the standard of a child’s library (United States v. Kennerley, 209 F. 119, 121.)
Not until 1957, however, did the Supreme Court declare impermissible and unconstitutional a standard of obscenity which rested on the tendency of the objectionable material to corrupt the morals of the young or immature. (See Butler v. Michigan, 352 U. S. 380, 382-383; see, also, Brown v. Kingsley Books, 1 N Y 2d 177, 188-189, supra; Matter of Excelsior Pictures Corp. v. Regents of Univ. of State of N. Y., 3 N Y 2d 237, 241-242.) The consequence of such a standard, wrote the court in the Butler case, “is to reduce the adult population * *. * to reading only what is fit for children ” and it must fall on this account because it is “ not reasonably restricted to the evil with which it is said to deal ” (352 U. S., at p. 383). In Roth v. United States (354 U. S. 476, supra), the Supreme Court went further and repudiated both of the objectionable aspects of the Hichlin rule, declaring (p. 489): “ The Hichlin test, judging obscenity by the effect of isolated passages upon the most susceptible persons, might well encompass material legitimately treating with sex, and so it must be rejected as unconstitutionally restrictive of the freedoms of speech and press.”
It is apparent, however, that, although the Butler and Roth cases destroy the Hichlin rule, they do not lay down a test of obscenity binding on our interpretation of this State’s obscenity statute. (See Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 55.) In the Butler case (352 U. S. 380, supra), the court merely condemned the statute before it without suggesting a constitutionally sanctioned alternative. In the Roth case (354 U. S. 476, supra), the court did say that “ Obscene material is material which deals with sex in a manner appealing to prurient interest ’ ’ (p. 487) and that the test was “ whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest ” (p. 489). These statements, however, can only indicate *586 the broad boundaries of any permissible definition of obscenity under the United States Constitution; they do not pretend to, and cannot, give specific content to the meaning of “ obscene ” as it appears in o.ur statute.
As we wrote in Brown v. Kingsley Books (1 N Y 2d 177, 181-182, supra), the concept of obscenity is “imprecise”, its “‘vague subject-matter ’ being largely ‘ left to the gradual development of general notions about what is decent ’ ’ ’. Accordingly, the problem involved in laying down a standard is to find ‘ ‘ the present critical point in the compromise between candor and shame at which the community [has] arrived”. (United States v. Kennerley, 209 F. 119, 121, supra.) To be sure, there are some in the community who regard any realistic portrayal of sexuality, any form of erotic realism, as an insupportable threat to the social order. And there are others who view any intrusion of the State’s power in this area as unnecessary and improper. The “ critical point in the compromise ” lies between these extremes. ‘ ‘ All that we can say is that the line [must] be higher than the lowest level of moral principle and practice, and lower than the highest”. (Cardozo, Paradoxes of Legal Science, p. 37.)
Mindful of the constitutional necessity to open the door barring state intrusion into this area “ only the slightest crack necessary” (Roth v. United States, 354 U. S. 476, 488, supra), and desirous of erecting a standard which embodies the most universal moral sensibilities and may be applied objectively, we are of the opinion that the prohibitions of section 1141 of the Penal Law should apply only to what may properly be termed ‘ ‘ hard-core pornography ’ ’. The mere undemonstrated possibility of harm to the community from realistic accounts of normal sexuality is not of sufficient moment to warrant the exercise of the public force in their suppression. And this is true whether the narratives concerned may be said to have artistic or scientific justification or whether they lack anything of “ any possible value to society”. (Winters v. New York, 333 U. S. 507, 510, supra; see, also, Hannegan v. Esquire, Inc., 327 U. S. 146, 153, 158, supra.)
As the Supreme Court observed in the Roth case (354 U. S. 476, 487, supra), “sex and obscenity are not synonymous.” (See, also, Mounce v. United States, 355 U. S. 180, revg. 247 *587 F. 2d 148; One, Inc., v. Olesen, 355 U. S. 371, revg. 241 F. 2d 772; Sunshine Book Co. v. Summerfield, 355 U. S. 372, revg. 249 F. 2d 114.) Under our statute, section 1141 of the Penal Law, the test of the obscene, of the pornographic, is not in the tendency or appeal of the material, but rather in its content objectively appraised. (See Lockhart and McClure, Censorship of Obscenity : The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 58-68.) It focuses predominantly upon what is sexually morbid, grossly perverse and bizarre, without any artistic or scientific purpose or justification. Recognizable “ by the insult it offers, invariably, to sex, and to the human spirit ” (D. H. Lawrence, Pornography and Obscenity [1930], p. 12), it is to be differentiated from the bawdy and the ribald. Depicting dirt for dirt’s sake, the obscene is the vile, rather than the coarse, the blow to sense, not merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness and represents, according to one thoughtful scholar, “ a debauchery of the sexual faculty”. (Murray, Literature and Censorship, 14 Books on Trial 393, 394; see, also, Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn. L. Rev. 5, 65.)
' Applying this standard to the issue of the magazine before us, it is plain that it does not fall within the proscribed area. This is so because no one of its stories or pictures is obscene within the meaning of section 1141 of the Penal Law. If any single item, considered as a whole, were pornographic, the circumstance that it was included in a collection otherwise without taint would not save it from criminal, prosecution. The fact is, however, that, while the magazine contains many stories or pictures which are aesthetically tasteless and without any redeeming social worth, none of them is pornographic. Numerous pictures and cartoons of nude or semi-nude women and numerous descriptions and depictions of sexual arousal and satisfaction are to be found in ‘1 Q-ent ’ ’, but it contains nothing which smacks of sick and blatantly perverse sexuality. Whether or not, therefore, the defendant had previous knowledge or notice of the content of the magazine, we may not say that its sale constituted a violation of our obscenity statute.
Were we to judge the magazine before us in terms of our personal views of its social value, of its moral and aesthetic worth, *588 we would condemn it out of hand for its vulgarity no less than for its banality. Basic principles of jurisprudence, however, command us to put to one side all personal predilections, including our distaste for commercial exploitation of sensuality. It is our conclusion that the magazine, appraised as objectively as is possible in the light of First Amendment concepts, may not be adjudged obscene without impairing the vital social interest in freedom of expression.
The order appealed from should be affirmed.

. See Alpert, Judicial Censorship of Obscene Literature, 52 Harv. L. Rev. 40; Blanshard, The Right to Read (1955), pp. 138-167; Ernst and Seagle, To the Pure (1928), ch. XIII; Larrabee, The Cultural Context of Sex Censorship, 20 Law and Contemporary Problems 672, 676-681; Weeks, This Trade of Writing (1935), pp. 126-147; Cairns, Freedom of Expression in Literature, 200 The Annals 76, 76-84; Mencken, Prejudices, Fifth Series (1926), pp. 15-21.

. See, e.g., Bell, Youth Tell Their Story (1938), pp. 40-42; Ernst and Seagle, To the Pure (1928), eh. XII; Gellhorn, Individual Freedom and Governmental Restraints (1956), pp. 60-67; Jahoda and Staff of Research Center for Human Relations, New York University (1954), The Impact of Literature: A Psychological Discussion of Some Assumptions in the Censorship Debate; Mead, Sex and Censorship in Contemporary Society, New World Writing, Third Mentor Selection (1953) ; Scott, Into Whose Hands (1945), D. 20; Wertham, Seduction of the Innocent (1963); Hearings Before the *583 Select Committee on Current Pornographic Materials of the House, 82d Cong., 2d Sess. (1958); Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary, Sen. Res. 62, 84th Cong., 1st Sess. (1965) ; Report of the New York State Joint Legislative Committee to Study the Publication of Comics, N. Y. Legis. Doe., 1954, No. 37.