**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John DARNELL, III, Defendant-
Appellant.**

**No. 152, Docket 27692.**

United States Court of Appeals
Second Circuit.

Argued Nov. 29, 1962.

Decided April 26, 1963.

---

1. Galveston Exhibition Ass'n v. Perkins, 80 Tex. 62, 15 S.W. 633.

Leonard P. Moore, Circuit Judge, dissented.

John F. Lambert, Greenwich, Conn., for defendant-appellant.

Arnold Markle, Asst. U. S. Atty., D. Conn., New Haven, Conn. (Robert C. Zampano, U. S. Atty., New Haven, Conn., on the brief), for plaintiff-appellee.

Before CLARK, MOORE and KAUFMAN, Circuit Judges.

## PER CURIAM.

Defendant mailed to a married woman of his acquaintance a letter wherein he discussed more frankly than fastidiously his and her personal relations with her husband, including homosexual practices described baldly in four- and three-letter words. Her complaint to the postal authorities, on receipt of the letter, set the inevitable wheels of justice in motion, to result in his conviction of violation of 18 U.S.C. § 1461, a six months' prison term suspended, and an order for probation for two years.

There is no dispute as to the facts as found by the judge on waiver of trial by jury, and we can find no escape from holding the letter at least "filthy" under current precedents culminating in Roth v. United States, 354 U.S. 476, 492, 77 S. Ct. 1304, 1 L.Ed.2d 1498, affirming United States v. Roth, 2 Cir., 237 F.2d 796, 797–799, 799–800. This is a result which we cannot view with satisfaction, since a private communication only brought to light by the addressee would hardly seem to merit criminal prosecution, particularly when it involves merely use of coarse language for which the writer could have substituted more refined phraseology, had he been so minded. But as the Roth case and other authorities, such as Congressional hearings, show, this statute is an important part of deeply cherished legislation, Congress having passed 20 obscenity laws from 1942 to 1956, with similar laws in force in practically all the states and supported by international agreements of over 50 nations. It is not appropriate for a constitutionally "inferior" federal court to set itself against legislation so strongly buttressed as this now is, however distasteful enforcement may be in a particular instance.

Conviction affirmed.

LEONARD P. MOORE, Circuit Judge (dissenting).

Within the framework of this rather simple state of facts, I find disturbing consequences. Summarized briefly, the problem is this: Citizen A, not thinking too well of Citizen B, decides to write B (a married lady) a letter. A writes the letter, seals it, entrusts it to the United States mails and, in due course, it is received by Mrs. B, whom A knows apparently quite well. The defendant addresses Mrs. B as "Dear Lovely Becky" and, after saying, "Bob [Mr. B] said he told you everything * * *", states the purpose of the letter, i. e., "This is just to make sure he did tell you." The letter relates largely to the marital and extramarital affairs of Mr. and Mrs. B and to a divorce and then a return. There is a reference to the fact that B had told A of Mrs. B's affairs and of some "couple switching" before the divorce and return. A then feels impelled to reveal that B has told him that he prefers homosexual relations with A to the more orthodox relations with Mrs. B. The purpose of the letter is informational; the primary subject matter, homosexuality. The general character and tone of the letter is not

elevated by the use of two words, quite Chaucerian in character, which are employed to describe rather specifically the areas of these anatomical preferences. Probably had the defendant added parenthetically "in the words of Chaucer", all would have been well, but probably neither writer nor addressee had taken a course in Chaucer. Had A, now the defendant, employed the physiological or anatomical terms to be found in Gray's "Anatomy", he undoubtedly would not have found himself in the toils of the law. The defendant says (and with complete plausibility) that had he used such words, the addressee would not have understood them. It must be remembered that there is a substantial segment of our society whose speech consists in good part of participial adjectives with four-letter or Chaucerian words as roots. To be sure, this vast collection of words and phrases has not yet qualified for Webster's Dictionary, but this deficiency has been recently remedied by an entire dictionary of such words and phrases, available at the better bookstores and entitled, "The Dictionary of American Slang", in the pages of which are to be found a wide assortment of four-letter words and their varied usages. In using these two words says the defendant, he chose words the addressee would understand. These are the identical words used dozens of times in "Lady Chatterley's Lover"[1] and in any war-story best seller containing dialogue between members of the armed forces of various nations. And their use was not because Lady Constance would not have understood more refined terms. Yet I am convinced that the use of these words may well have been the cause of the book's enormous sale rather than because of a passionate desire on the part of the American public to become schooled in the art of becoming successful gamekeepers on a British estate.[2] In addition, the letter contains references to other homosexual possibilities in the B household and to a statement attributed to Mr. B that he would not mind if A sent some of his Navy friends to visit Mrs. B.

When Mrs. B received the letter, she was, needless to say, not pleased. She took the letter to her local minister, from thence to the postal authorities, from thence to the United States Attorney, and from thence to the courts which, because of the practical necessity for interpretation of the words of the statute and for final decision, have been forced to sit as a body of censors. The very nature of the problem calls for and produces decisions virtually on an *ad hoc* basis.

The trial judge pronounced his judgment of conviction at the close of the testimony. This result I find quite in conflict with the decisions of the Supreme Court of the United States and New York's highest court. I am opposed to criminal sanctions[3] for the writing of

1. Grove Press, Inc. v. Christenberry, 276 F. 2d 433, 2d Cir., 1960.

2. Only for the true sportsman has the book been properly reviewed and appreciated. In Field & Stream, November, 1959, appeared the following "Book Review":
"Although written many years ago, Lady Chatterley's Lover has just been reissued by Grove Press, and this fictional account of the day-by-day life of an English gamekeeper is still of considerable interest to outdoor-minded readers, as it contains many passages on pheasant raising, the apprehending of poachers, ways to control vermin, and other chores and duties of the professional gamekeeper. Unfortunately one is obliged to wade through many pages of extraneous material in order to discover and savor these sidelights on the management of a Midlands shooting estate, and in this reviewer's opinion this book cannot take the place of J. R. Miller's Practical Gamekeeping."

3. The defendant, in brief, asserts (and I choose to believe it) that the Post Office Department regularly receives dozens of letters, far worse than his letter, written by college students to the objects of their affection after she (collectively) has jilted him and the blighted romance of the Prom has turned to the need of verbal vengeance for unrequited love. Yet are we after every Spring Prom to fill our prisons with such college students?

private letters dealing with homosexuality and containing four-letter words, [4] anatomical or scatological, even though used in a letter dealing with matters not altogether parlor conversation. After all, the defendant only used one once. As for the three-letter word (also used but once) referred to by the majority, I seriously doubt that "contemporary community standards" call for jail sentences because of its use to indicate the anal area. I had rather thought that every discerning first grade grammar school teacher had by now faced the duality of meaning between the patient beast of burden and the nether anatomical regions and by an initial understanding of such duality with the students at the opening of school avoided countless titters from the class for the remainder of the term.[5]

Certainly this young man should not be convicted of a crime for the use of these two words. What remains? Merely the news announcement of the homosexual practices of Mr. B. It, therefore, is my conclusion that this single, non-commercial, private letter does not, and should not, come either within the intendment or the wording of Section 1461. To justify this conclusion, several of the recent decisions must be examined.

Since 1957 when Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), was decided, the arousal of "prurient interest" has rather been the keynote of the decisions following it. This term, certainly not self-defining, was said by Mr. Justice Harlan to mean "material having a tendency to excite lustful thoughts". Even this definition requires further specificity because one must interpolate—lust for what? Obviously for sex. But the highest court recognizes that "sex and obscenity are not synonymous" (Roth, p. 487, 1310 of 77 S.Ct.). Therefore, to meet with disapproval, it must be impure or perverted sex. Yet homosexuality is not regarded in this to-be-banned category because the Supreme Court straightway after Roth did not wish to deter the United States mails from disseminating throughout the country a magazine especially intended for homosexuals. One, Inc. v. Oleson, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 ("The Homosexual Magazine"). Shortly thereafter "Lady Chatterley's Lover" was given valuable publicity by the courts although Mellors' use of words for the anatomical parts involved would make our defendant here appear to be quite a restrained prude.

Most recently the Supreme Court had before it another magazine admittedly designed and published for the homosexual trade. Manual Enterprises, Inc. et al. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), revg., 110 U.S. App.D.C. 78, 289 F.2d 455 (D.C.Cir., 1961). There the trial judge and a unanimous court of appeals had found the magazine to offend section 1461. But the Supreme Court reversed despite administrative findings, which the Supreme Court accepted, that the magazine was composed primarily for homosexuals, had no literary or scientific merit, would appeal to the "prurient interest" of sexual deviates, that it would be read almost entirely by homosexuals and that the ordinary male adult would not buy it. Mr. Justice Harlan created a new and essential ingredient which he called "patent offensiveness"—a term connoting an affront to "current community standards of decency". Because the homosexual magazine did not have this essential quality but only frequently untouched pictures of naked male models in assorted poses and appropriately writ-

---

4. It is not beyond the realm of imagination to state that members of the judiciary (not to exclude other professions) might audibly resort to old English but forceful expressions after failing by one inch to sink a long putt or thereafter in the locker room stories.

5. The printing of this same word was not sufficient to ban an interesting historical survey of pornography, "The Erotic in Literature," by David Loth, p. 12 (1961). See, also, "Pornography and the Law" by Drs. Eberhard and Phyllis Kronhausen (1959).

ten material for those interested in further pursuit of the subject, it became unnecessary to consider the "prurient interest" aspect or "the question of the proper 'audience' by which their 'prurient interest' appeal should be judged" (Id. p. 482, 82 S.Ct. p. 1434). "Obscenity under the federal statute thus requires proof of two distinct elements: (1) patent offensiveness; and (2) 'prurient interest' appeal" (Id. p. 486, 82 S. Ct. p. 1436). The Court was less specific as to how these elements were to be determined—and by whom. Almost all appellate courts are convinced (as am I) that the final decision should rest not with a postal inspector, the Postmaster General or even with a trial judge. The dangers of potential quixotic censorship are apparent. Even courts of appeal must yield and properly so because if the test under the statute "is a national standard of decency" (Id. p. 488, 82 S. Ct. p. 1437), the Supreme Court is far more able to set this standard than the more regional courts. That Court has shown no hesitation in substituting its judgment for that of lower courts.[6] Certainly it should assume this responsibility because it can see pictures and read writings without the aid of a fact-finding interpreter in the guise of a lower court.[7] In Manual Enterprises the spectre of censorship guided three justices to their conclusion that Section 1461 does not authorize the Postmaster General to close the mails to matter which, in his view, falls within the ban

of that section. Id. pp. 495–519, 82 S.Ct. p. 1441.

Turning now to the "letter" cases, a somewhat anomalous situation is found to exist. Congress, when enacting protective laws, in theory, should act for the protection of the public on a national basis. Therefore, one would think that the dissemination of homosexual material to the country at large would call for stricter judicial censure than a mere factual statement of such practices between two individuals in a private letter, albeit there are such wide factual differences between the situations presented in the cases now to be reviewed and the situation here that these cases (two of which are relied on by the majority) should not be regarded as controlling.

In United States v. Limehouse, 285 U. S. 424, 52 S.Ct. 412, 76 L.Ed. 843 (1932), the defendant had sent out thirty letters containing "foul language", charging the addressees with "sexual immorality" and in some cases with "miscegenation and similar practices" (p. 425, 52 S.Ct. p. 412). The Court was satisfied that filthy letters which related to sexual matters came within the interdiction of the statute. Verner v. United States, 183 F.2d 184, 9th Cir., 1950, dealt with two letters sent to two persons, strangers to the writer. The contents were not disclosed in the opinion because of a natural reluctance by the courts not to reveal to the public that which the statute endeavors to discourage. However, an attack was made therein on the chastity

---

6. See, Times Film Corp. v. Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed. 72 (revg. 244 F.2d 432, 436 [7th Cir.] on a film dealing with the seduction of a sixteen-year-old boy by an older woman, and other "illicit sexual intimacies and acts") ; Mounce v. United States, 355 U.S. 180, 78 S.Ct. 267, 2 L.Ed.2d 187 (revg. 247 F.2d 148 [9th Cir.] nudist publications; see United States v. 4200 Copies Intl. Journal, 134 F.Supp. 490 [E.D., Wash.]); One, Inc. v. Oleson, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 (revg. 241 F.2d 772 [9th Cir.] dealing with a post office order in respect of "One—The Homosexual Magazine") ; Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2

L.Ed.2d 352 (revg. 101 U.S.App.D.C. 358, 249 F.2d 114 [Ct.App.D.C.] nudist material).

7. "That issue [obscenity] * * * is ultimately one for this Court. The relevant materials being before us, we determine the issue for ourselves." Manual Enterprises, Inc., p. 488, 82 S.Ct. p. 1437 " * * * if an appellate court were to rely upon and be bound by the opinion of the trier of the facts as to the obscenity of a publication it would be abdicating its role as an arbiter of constitutional issues." (People v. Richmond County News, 9 N.Y.2d 578, 581, 216 N.Y.S.2d 369, 370, 175 N.E.2d 681, 682.)

of a former paramour and a lewd suggestion made concerning her to the addressee. The test stated by the court was, "The letters were nonmailable material if they had a tendency to deprave or corrupt the morals of those who would receive them." However, for some reason, evidence that the recipients would not have been affected by the contents was excluded. On appeal this exclusion was held to have been proper because the effect "on the minds and conduct of the recipients" was immaterial (p. 185). In Cain v. United States, 274 F.2d 598, 5th Cir., 1960, the court found the language (not disclosed in the opinion) to be shocking and disgusting "fit for use only in gutters, brothels, and like places" and that the letters "villified, defamed, and * * * sought to debase and defile the woman to whom they were addressed." The letters, said the court, accomplished the purpose "of assaulting the sensibilities, and disturbing the peace of mind, of the recipient, his intended victim" (p. 600). But *quaere*, whether the statute was enacted to protect the "peace of mind" and the "sensibilities" of womanhood? This question is not intended to convey the thought that I am opposed to chivalry but I seriously doubt that this quality is best achieved by jail threats. Usually, the fair sex inspire it without Congressional assistance.

In Ackerman v. United States, 293 F. 2d 449, 9th Cir. (1961), the defendant sent five letters to another gentleman which the court found to be "filled with wildly erotic, filthy, prurient comments and inquiries concerning the details of the addressee's private parts, which could have no conceivable worth for artistic, literary, scientific or serious research" couched "in the form of vulgar, sordid, provocative, erotic imagery and evident prurient appeal * * *" (pp. 451–452). Pictures also were enclosed with the letters. Again, reasons of delicacy prompted the court not to reveal the language but little imagination is necessary to surmise that the letters fall within that category of "hard-core pornography" in which the letter form is used to give a semblance of reality to practices which are largely (I trust) the fictional creation of somewhat perverted minds.

In New York[8] the courts have been kept busy with the same problem. As might be expected, there are situations clearly within the statute and clearly without and, of course, the troublesome borderline case. The decisions, however, should be quite helpful in reaching the correct result here. On the one hand, there are the cases in which the magazines and letters sold surreptitiously to the public are designed solely to appeal to "prurient interest". They are the standard sado-masochistic, bound, gagged and tortured type with grossly exaggerated drawings, including all the usual fetishes and stories appealing only to a cult (if such exists) of (by normal standards) perverts.[9]

On the other hand, the New York courts have reversed convictions because of reasonable doubt where untouched photographs of nudes, male and female and magazines containing such pictures and stories relating to erotic sex experiences, were involved.[10]

8. For all practical purposes, the New York statute is sufficiently similar to Section 1461 in the type of literature proscribed. N.Y.Penal Law, Section 1141.

9. In this group are the materials before the courts in People v. Zucker, 15 A.D.2d 883, 225 N.Y.S.2d 154 (1962) (three books, all grotesquely sadomasochistic); People v. Mishkin, 17 A.D.2d 243, 243 N.Y.S.2d 342 (1962) (a large assortment of books of the same character as in Zucker); People v. Fried, App.Div., 238 N.Y.S.2d 742, March 27, 1963 (photographs and a book, "College for Sinners," portraying imaginative and highly perverted sex orgies amongst teenagers, and another entitled "Sex Cat"); and People v. Finkelstein, 11 N.Y.2d 300, 229 N.Y.S. 2d 367, 183 N.E.2d 661 (1962), cert. den. 371 U.S. 863, 83 S.Ct. 116, 9 L.Ed.2d 100 (two books, "Garden of Evil" and "Queen Bee," obviously written to arouse "prurient interest").

10. People v. Rotto, 13 A.D.2d 634, 213 N.Y.S.2d 536 (1961); People v. Grasberg, 13 A.D.2d 635, 215 N.Y.S.2d 1

One of the most thoughtful and thorough opinions on the subject of the intent and coverage of obscenity statutes is that of Judge Fuld in the New York Court of Appeals (People v. Richmond County News, 9 N.Y.2d 578, 216 N.Y.S. 2d 369, 175 N.E.2d 681 (1961)). There, he (as we should here) assumes full appellate responsibility for passing upon the material in question, saying:

"This court, as the State's highest tribunal, no less than the United States Supreme Court, cannot escape its responsibility in this area 'by saying that the trier of the facts, be it a jury or a judge, has labeled the questioned matter as "obscene," for, if "obscenity" is to be suppressed, the question whether a particular work is of that character involves not really an issue of fact but a question of constitutional *judgment* of the most sensitive and delicate kind.'" (Roth v. United States, 354 U.S. 476, 497–498, 77 S.Ct. 1304, 1315–1316, 1 L.Ed.2d 1498 [Harlan, J., concurring]; see, also, Feiner v. New York, 340 U.S. 315, 316, 71 S.Ct. 303, 95 L.Ed. 267; Watts v. Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 93 L.Ed.2d 1801; Norris v. Alabama, 294 U.S. 587, 589–590, 55 S.Ct. 579, 79 L.Ed. 1074; Lockhart and McClure, Censorship of Obscenity: The Developing Constitutional Standards, 45 Minn.L. Rev. 5, 114–120). (p. 580, 216 N.Y. S.2d 569, 175 N.E.2d 681)

Referring to Roth standards which compel a strict construction of the statute, he wrote:

"Although the Constitution does not, therefore, stand as a barrier against legislation making obscenity criminal, it does stand as a limitation on such legislation of such a sort as to compel us to construe it strictly. The danger of a violation of cherished First Amendment rights necessitates narrow construction; we may open 'the door barring federal and state intrusion into this area * * * only the slightest crack necessary'." (Roth v. United States, 354 U.S. 476, 488, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498, supra.)

After reviewing the opinions of the various authors who have written both *pro* and *con* on the possible erotic responses which so-called pornographic literature may invoke, he concludes (wisely, in my opinion) that the exercise of public force to suppress presents a real danger, that under Roth (and I would now add Manual Enterprises) the door of censorship should be opened "only the slightest crack necessary" (Roth, p. 488, 77 S.Ct. p. 1310); and that "the Penal Law [N.Y.Penal Law, § 1141], should apply only to what may properly be termed 'hard-core pornography'." (Id. p. 586, 216 N.Y.S.2d p. 375, 175 N.E.2d p. 685).

The same conclusion was reached in the Massachusetts Supreme Court as in Richmond County News in a recent comprehensive and well-reasoned opinion by Mr. Justice Cutter. The book in question was "Tropic of Cancer". There, despite the Court's belief "that the book at many places is repulsive, vulgar, and grossly offensive in the use of four-letter words, and in the detailed and coarse statements of sexual episodes", the majority held that it could not be treated "as hard-core pornography" and, hence, "not 'obscene' in the constitutional sense". Attorney General v. The Book Named "Tropic of Cancer", Mass., 184 N.E.2d 328 (the Massachusetts statute G.L. c. 272, § 28C, uses the words "obscene, indecent or impure").

By these standards, the defendant's letter cannot possibly come within the statute. We cannot give household definitions to "filthy" and "indecent". What mother would not say to her twelve-year-old son who employed either or both of

the words here in question, "Stop using such filthy language"? But is this to be the test by which "filthy" is legally construed? As for "indecent", I assume that a fashionable matron receiving a letter from an old friend and admirer suggesting in his most cultured *magna cum laude* university prose an extra-marital dalliance when her husband would be out of town might well characterize the proposal as indecent but such a letter would scarcely come within the statute. Yet is the same proposal, in substance, to come within the statutory law merely because in another letter the writer without educational advantages beyond the gutter expresses the same thought to his inamorata in the only words which he and she understand?

The problem has also been of concern to many scholars who have considered it.[11] If revelations of homosexual practices set forth in sealed private letters are to be brought within the purview of the statute, then let it be publicly known that the public writes at its peril and that only that should be written which will pass the ultimate censorship of judges and juries. If true enforcement is to be obtained, the Post Office Department will have to keep steam kettles boiling on a twenty-four hour schedule so that offenders may be apprehended. If this letter, so patently not intended to pander to the "prurient", and not doing so when read in its entirety, keeping in mind its purpose (quite largely informational), is to be held the means of imposing a criminal conviction upon this young man, then we really have cause for worry. "1984" and "Big Brother" are already here.[12]

In my opinion, this letter scarcely called for prosecution under the statute. I cannot square conviction with the applicable decisions. Hence, I would reverse.

11. For a thoughtful and excellent analysis and consideration of the many questions involved, see "Morals and Constitution: The Sin of Obscenity" by Professor Louis Henkin in the March 1963 issue of the Columbia Law Review (63 Col.L. R. 391).

12. George Orwell, "1984."