**People of the State of Illinois, Plaintiff-Appellee, v. Richard Gregory, a/k/a Dick Gregory, Defendant-Appellant.**

Gen. Nos. 51,650–51,653.

First District, First Division.

May 13, 1968.

Jean F. Williams, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and David B. Selig, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a jury trial in the First Municipal District of the Circuit Court of Cook County, held in the City of Chicago, four misdemeanor complaints against defendant Richard Gregory (also known as Dick Gregory) were consolidated for trial. Defendant was found guilty of two offenses of battery in violation of section 12–3 (Ill Rev Stats, c 38) and two offenses of resisting a police officer in violation of section 31–1 of chapter 38. The trial court sentenced defendant to imprisonment in the county jail for a period of five months and a fine of $200 on each of the two battery charges, and to imprisonment in the county jail for a period of five months and a fine of $500 on each of the resisting a police officer charges. The imprisonment terms were ordered to be served concurrently. Defendant's separate appeals were consolidated here on defendant's motion.

The four complaints arose out of a civil rights demonstration. The complainants were Edward J. McGee and Raymond Cisco, Chicago police officers. The two battery complaints alleged that defendant, on June 11, 1965, at "Columbus Drive and Balbo," committed the offense of "Battery in that he knowingly and intentionally without legal justification committed a battery" on Edward McGee, and on Raymond Cisco, in violation of chapter 38, section 12–3. The other two complaints alleged that defendant on June 11, at "Columbus Drive and Balbo," committed the offense of "Resisting a Police officer in that he knowingly resisted a police officer in performance of his duties."

On April 18, 1966, the four complaints came on for trial. At the opening of court, defendant's counsel in-

formed the court that defendant Gregory was in New York and asked the court to proceed without him. A number of pretrial motions were heard, and the court, over defendant's objection, allowed the motion of the State to consolidate the four complaints for the purpose of trial, and the trial was adjourned to April 19, 1966. On April 19, 1966, a jury of twelve men and women was sworn to try the issues. At the trial, five police officers and a newspaper reporter testified for the State. Defendant was represented by three attorneys, all of whom actively participated in the proceedings but did not cross-examine any of the State's witnesses. At the end of the State's case, defendant's counsel, in open court and before the jury, said, "There will be no defense offered on behalf of the defendant, Richard Gregory, we stand mute." On April 22, the jury returned a separate verdict of guilty on each complaint, either "Battery" or "Resisting a Police officer," "in the manner and form as charged in the complaint."

Defendant's contentions on appeal are:

1. The complaint did not allege that the offense occurred within the jurisdiction of the Municipal Court of Chicago, First Municipal District of the Circuit Court of Cook County, Illinois, and said court lacked jurisdiction.

2. When the court grants a defendant leave to withdraw his plea of not guilty, and does not re-arraign the defendant nor enters a plea for him, there is no issue, there is nothing to be tried by a jury and the court has no jurisdiction.

3. Systematic exclusion of Negroes from the jury denied the defendant a fair trial by an impartial jury, was a denial of due process and equal protection of the law.

4. Refusal to allow defendant to use twenty peremptory challenges was prejudicial error.

5. After defendant had exhausted all peremptory challenges allowed by the court, denial of defendant's motion to excuse a juror for cause, who had made statements indicating a decision regarding a material fact was prejudicial error and requires a reversal.

6. Testimony relative to the absence of defendant from a portion of the trial was improper, incompetent, prejudicial and deprived defendant of a fair trial.

At the trial, John Kelly, Deputy Chief of the Patrol Division of the Chicago Police, testified that on June 11, 1965, he had occasion to be near Soldiers' Field in Chicago at about 12 o'clock noon. He conferred with Al Raby, Richard Gregory, Rev. Reddick and a number of others active in civil rights movements. Raby was the spokesman, and a planned route of a demonstration march was agreed upon. The marchers were to be permitted two lanes of travel which were normally used for vehicular traffic. At approximately 2:00 p. m., in the area of Balbo and Columbus Drive, he saw the marchers and demonstrators cross Columbus Drive, and he "had men to channel the two lanes to one lane, and the balance to be on the sidewalk." A meeting was had with the march leaders and police officers. After the meeting was held, "one of the Civil Rights Group went hollering, 'Sit down,' " and approximately 300 sat down in the street. They sat in the intersection of Balbo and Columbus, and "all traffic was stopped." He instructed police officers with portable announcers to tell the group to cease blocking the intersection or they would be placed under arrest, and the response was "boos, catcalls, cheering and singing." He went through the crowd and advised the people if they would stand they would not be arrested; if they continued to sit they would be placed under arrest. Approximately 200 remained seated, and they were taken into custody and confined in the 1st

400

and 21st District police stations. He saw defendant Richard Gregory seated in the intersection.

Raymond Cisco, a Chicago police officer, testified he was assigned to direct traffic around demonstrators who would be marching and to maintain peace. At approximately 2:00 p. m., and at the orders of their leaders, the marchers sat down and refused to get up. After having arrested five people, he approached the defendant and told him to get up or he would be placed under arrest. Defendant cursed him and said, "You're Richard's storm troopers, no better than the Alabama troopers." The officer reached over to grab defendant's right arm, and defendant fell back and started kicking. The officer was kicked in the groin and, after doubling up, he was kicked on the arm and chest. Officer McGee was behind him, and he heard him say, "Let go my finger." He couldn't remember much after that because he was nauseated. He, Officer McGee, other arrestees and the defendant entered a police van. Defendant was shouting loudly. Defendant told Officer McGee that they were picking on him "because he was a 'nigger.' " When Officer McGee asked defendant why he bit him, defendant replied, "You were stealing my money." This was denied by Officer McGee, and defendant said, "This is civil disobedience, and we are disobedient because this brings attention to us." Later, Cisco and McGee were taken to a hospital.

Edward McGee, another Chicago police officer who arrested ten of the demonstrators and assisted in the arrest of the defendant, testified that Officer Cisco approached the defendant and told him to get up or he would be arrested. The defendant began to curse and shout and, as Cisco bent over defendant, the defendant kicked him in the groin. McGee was kicked in the chest. He grabbed the defendant's left arm and tried to pick him up. The defendant grabbed the hair on his chest, ripped his shirt,

and bit him on the thumb. Another officer got McGee's hand out of the defendant's mouth. Cisco was holding his stomach and trying to vomit.

Raymond Minus, a Chicago police officer, testified to the events leading up to the arrest of defendant. He observed the defendant talking with Officer Cisco and subsequently saw the defendant lean back on his hands and kick Officer Cisco in the groin. After the officer doubled over, he saw defendant kick him again on the left elbow. He heard Officer McGee say, "Ouch, let my arm go," and he jerked McGee's arm from defendant's mouth.

John Patrick Lavin, a reporter for the Chicago Daily News, testified he was present when the police requested the marchers to narrow to three abreast because of the oncoming traffic and the ensuing danger. The marchers sat down, and he heard the police tell them that they were creating a nuisance, and if they didn't get up they would be arrested. He was about 20 feet from defendant when he was arrested. He saw two police officers approach defendant and say something to him. As they started to pick defendant up, he stiffened and started kicking and grabbing while yelling. He later had a conversation with the defendant, who stated that he had kicked the policemen with all his might. The defendant said the policemen were trying to get his money out of his pocket—"I asked him how could they possibly take his money in front of all the newspaper reporters and the police officials, and he responded that was why he was kicking."

Considered first is defendant's contention that the four complaints were fatally defective because "none of the four complaints allege in what city, county or state the offenses occurred. For this reason, the Court lacked jurisdiction," and "deprived defendant-appellant of his constitutional rights to due process and equal protection of the laws as well as the right to be tried in the 'county

or district in which the offense is alleged to have been committed.' "

■ A discussion of authorities is not required because the determinative pronouncements made by our Supreme Court in People v. Williams, 37 Ill2d 521, 229 NE2d 495 (1967), are controlling here. In that case a similar form of complaint was used, and the offense was alleged to have occurred at "900 S. Winchester," and no city or county was named in the body of the complaint. On page 524, it is said:

> "If we look at the entire complaint in this case, the conclusion seems unmistakable that the complainant is describing an event that took place in Cook County. . . . Only by consciously refusing to look at the numerous references to that county, and concentrating solely upon the fact that the designation of that county does not follow the street address, is it possible to engender doubt. . . . Where, as in this case, there is no conflict between the caption and the body of the charge, no suggestion that the venue was improper or improperly proved, and no showing of prejudice to the defendant, we see no reason to refuse to read the caption as part of the complaint. So read, the complaint sufficiently designates the county in which the offense was alleged to have been committed."

We find that the four complaints sufficiently designated the city and county in which the offenses were alleged to have been committed.

We next consider defendant's contention that he was not properly arraigned, nor was a plea entered on his behalf by the court, and this requires a reversal. On April 19, 1966, before the selection of the jury commenced, defendant appeared in open court and pleaded "not guilty." Thereafter, on April 21, after the selection of a jury to try the issues, the court granted leave to the

defendant to withdraw his plea of not guilty to permit him to make a motion to quash the complaints. At that time counsel for defendant said, "On behalf of the defendant I would like to withdraw his pleading and allow him to stand mute. We will withdraw his plea of not guilty for the purpose of filing a motion to quash the complaint" on the grounds of "racial discrimination." Defendant's counsel also said, "Why, the defendant will stand mute." During the hearing of defendant's motions, the State remarked that defendant was not present in court. Miss Jean F. Williams, one of the attorneys for defendant, stated, "There was already a discussion as of Monday, the 18th, according to the State, it is not necessary for the defendant to be present." The State: "You are waiving his presence?" Miss Williams: "We are ready to proceed. . . . At this time counsel for the defendant is ready to proceed."

The court denied defendant's motions to quash after a lengthy hearing and then directed counsel for both sides to proceed with "opening statements." The State made an opening statement, at the end of which counsel for defendant said, "No opening statement."

Defendant argues that the "Procedure on Arraignment (c 38, § 113–1) sets forth mandatory statutory requirements which were not followed in his case. Defendant's authorities dealing with rearraignment include People v. Moore, 21 Ill App2d 9, 157 NE2d 94 (1959). In that case the State's Attorney was granted leave "to amend the information by interlineation" over the general objection of the defendant. The court said (p 16):

> "The record discloses not only that the information after it was amended was not sworn to but further discloses that no plea was ever entered thereto. A plea is not a mere formality. Whether the offense charged is a misdemeanor or a felony, a plea is essential to constitute an issue."

404

Defendant also cites People v. Economakas, 278 Ill App 265 (1934), in which the judgment of the trial court was reversed because the record failed to show that the defendant "filed or orally made in open court any plea to the amended information."

The State argues that both of the foregoing authorities show that the original informations were amended and charged different offenses than those charged in the original informations. The State asserts the instant complaints remained the same, and defendant knew the contents thereof. His plea was withdrawn at his request and not because of any activity of the People, and "Moreover, he did apprise the court that he would stand mute."

The State cites People v. Afton, 258 Ill 292, 101 NE 557 (1913), where the defendant entered a plea of not guilty after arraignment. Subsequently, with leave of court, he withdrew the plea in order to enter a motion to quash the indictment. The motion was overruled, but the record failed to show the renewal of the plea. There the court said (p 294):

> "The record in this case shows plaintiff in error asked and obtained leave of the court to withdraw his plea of not guilty for the purpose of entering a motion to quash the indictment. When the motion was overruled the trial proceeded without any objection on the part of the plaintiff in error, and we think it apparent that plaintiff in error, the State's attorney and the court considered and treated the overruling of the motion to quash as re-instatement of the plea."

■ In that case the court cited with approval a New York authority which noted "it would be sacrificing substance to form not to give effect to the transaction according to the plain understanding of the court and the parties." This statement applies here. Defendant was not prejudiced, and it was a just inference that all parties re-

405

garded the plea as having been withdrawn for the purpose of the motion only and proceeded to trial on the understanding that it was reinstated when the motion was denied.

Considered next is defendant's contention that there was a "systematic exclusion of Negroes from the jury," which denied the defendant a fair trial by an impartial jury.

On April 19, 1966, and before the voir dire examination of the jury commenced, defendant's counsel, Miss Williams, stated to the court: "I make a motion at this time to dismiss this voir dire which was brought into this courtroom. I bring to the Court's attention there are 32 veniremen were brought into this courtroom, among them only one a negro, one person appears to be a negro and I realize, of course, that this challenge must be made prior to the beginning. Now, if the Court please, we have no way of knowing prior to the time that the veniremen were brought into this courtroom that one, only one appeared to be a negro, in as much as the defendant is a negro, I submit this is in itself a violation of due process within the meaning of the Illinois Constitution, we would have challenged the choosing had we known, prior to the time they were present in this courtroom. . . . This does not represent a cross of the voters in Cook County, 1 out of 32. This would indicate something is wrong." The court stated, "Your comments are noted. . . . We will proceed." At that time defendant, in open court, entered his plea of "not guilty," and the voir dire examination then proceeded.

Later, and before hearing any testimony, defendant repeated the motion to discharge the jury, and the court denied it. Subsequently, and with leave of court, defendant filed a written motion nunc pro tunc, as follows:

"Motion to Discharge Jury Panel

"Comes now Richard Gregory, a/k/a, Dick Gregory, by Jean F. Williams, his attorney and moves, nunc pro tunc, this Court to discharge the jury panel assigned to this court on April 19, 1966, and as grounds for this motion states as follows:

"1. That on or about April 18, 1966, a jury panel was assigned to this Court upon orders of this court;

"2. That said panel consisted of approximately 30 persons, 5 of whom were Negroes;

"3. That thereafter, on or about April 19, 1966, when the trial of this defendant, himself a Negro, was again called up, a completely different jury panel of 32 persons was brought into this court and only one was a Negro;

"4. That the change or switch in jury panels was, among other things:

"a. improper and arbitrary

"b. clearly shows the second panel has been improperly selected or drawn

"c. violates the Constitutional rights of this defendant under the First, Fifth, and Fourteenth Amendments to the Constitution of the United States, and Article II, Sections 1, 2, 5, 9 and 10, of the Illinois State Constitution."

The report of proceedings does not show that a jury panel was present in the courtroom on April 18, 1966, at any time. The report of proceedings does show that on April 21, 1966, during the hearing of defendant's motions to withdraw his plea of not guilty, the court made the following statement for the record:

"THE COURT: The Court would like to make certain finding of facts.

"This matter was called for trial before me on April 19 [sic], 1966 at that time there was a conference, and the bailiff was instructed by me to bring me jurors, he went to the assembly room on the third floor of this building and asked to have a jury sent up in this court. We must start in the afternoon because we handicapped because of working in this courtroom every day from 9:30 to around 1:30 p. m., if we want to try a jury case we have to use this courtroom after 1:30 or 2:00 p. m.

"Now this case was called and we started on April 18, 1966 talking over motions a number of motions were made by various parties and I dictated a paragraph and some eleven orders were entered pursuant and the total time we in conference in the chambers.

"A jury was sitting, but had not been sworn to answer questions or anything like that. We came to the conclusion around 4:00 o'clock thereabouts we would not be able to start picking a jury that day, we continued, the jury was sent back to the jury room assembly room for work.

"The following day, April 19, 1966, after certain motions were made, the clerk was instructed to send for a jury, a jury was sent up.

"At that time a number of motions were made relative to a magistrate in the Circuit Court, jurisdictions and the articles of the constitution which was effective January 1, 1964, questions was raised as to my judicial power to hear such. We then went into the courtroom had the jurors stand and they were sworn to answer questions on the voir dire and 12 persons went into the box, the balance moved nearest to the front benches so they could hear I then gave the charges—four charges, two as to battery, two as to resisting arrest, the date of the oc-

408

currence, the place of the alleged occurrence and then proceeded with the fundamental principles and the broad fundamentals involving a jury trial, the right of the defendant and the presumption that prevailed with him and we then started to select a jury.

"As I recall around 2:00 o'clock by a quarter to 6:00 o'clock we had a discussion as to challenges, a motion was made by the defense counsel in view of the four charges, they felt the defendant was entitled to 20 challenges, 5 for each charge, rather than 5 for each defendant.

"The Court ruled they were entitled to 5 challenges and the first panel was selected they were sworn and then we sent 12 jurors to lunch at the County Jail in the custody of the bailiff and they were instructed not to discuss the matter, the remaining jurors seated back in the courtroom were sent out to eat and advised there were no facilities to feed them here. They returned at approximately 7:15, by 9:00 o'clock we had procured a jury. Before we started testimony, Miss Williams and Mr. Adam asked that the voir dire be dismissed and that motion was denied.

"Other motions as to the jurisdiction to try the case were also denied.

"We continued and then sent the jury home and advised them to return at 12:30 the next day to be taken to lunch and to return for the trial at 1:30 p. m. in the afternoon. The Court appeared, Mr. Jack Micheletto appeared and at various times Mr. Adam was here. The defendant Mr. Richard Gregory was not here and Miss Jean Williams was not here.

"At approximately 10 minutes to 4:00 o'clock the defendant appeared with Miss Williams, presented to the Court—copy petition filed in the Northern District of Illinois, Eastern Division U. S. District Court, and a receipt showing the charges filed made therefore by the Clerk's Office.

"At that time I went out and excused the jury, and asked them to return at 12:30 today where they would be taken to lunch in the County Jail and were to be fed and returned for trial in the afternoon.

"The Court then continued the cause generally until 11:30 this morning. The Court makes a further finding of law, the Court feels that even though the petition has been filed by the defendant, this case is not removable and the Court has jurisdiction to proceed and even where there is no statute—illiteracy test—purpose Section Title 28 US 1446, is not met here, therefore the Court states I have jurisdiction to start this matter at 2:30."

The following discussion between court and counsel then ensued:

"MISS WILLIAMS: . . . When Your Honor, stated that on April 18, 1966 the jury panel was brought up on that date, it was released then.

"Another finding of fact on April 19 a second group of jurors were brought up.

"THE COURT: No, not in those words.

"MISS WILLIAMS: Your Honor's next finding of fact, the Court ruled regarding the challenges allowed.

"In between the time of order for the second panel, a motion was made regarding the challenges, I wish

410

to refresh on this point I came into the chambers and advised Your Honor, there was a veniremen of 32 persons seated among whom was one negro.

"THE COURT: Counsel made a statement. The court recalls counsel advisement of 32 persons, one person looking like a negro.

"MISS WILLIAMS: I would like to go on the record, Your Honor, stated yesterday afternoon I was not present, nor was the defendant present, I would like to state, I shall not be present at 2:30 I anticipate being in Federal Court.

"I know of no requirement demanding my presence where there are two co-counsels in this court on the same case and it would by physically impossible for me to be present here and in Federal Court.

"MR. MICHELETTO: I object to any withdrawal of plea.

"THE COURT: Leave is granted for the defendant to withdraw his plea of not guilty.

"THE COURT: We will put this over until tomorrow."

Defendant's authorities on this point include Eubanks v. Louisiana, 356 US 584, where the court said (p 587):

"In Patton v. Mississippi, 332 US 463, 469, this Court declared, in a unanimous opinion, that 'When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of Negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand.' This is essentially the situation here. True, the judges now serving on the local court testified generally that they had not

411

discriminated against Negroes in choosing grand juries, and had only tried to pick the best available jurors. But as Chief Justice Hughes said for the Court in Norris v. Alabama, 294 US 587, 598, 'If, in the presence of such testimony as defendant adduced, the mere general assertions by officials of their performance of duty were to be accepted as an adequate justification for the complete exclusion of negroes from jury service, the [Equal Protection Clause]—adopted with special reference to their protection—would be but a vain and illusory requirement.' . . . [L]ocal tradition cannot justify failure to comply with the constitutional mandate requiring equal protection of the laws."

Also, in Whitus v. Georgia, 385 US 545 (1967), the court stated (p 550):

"The burden is, of course, on the petitioners to prove the existence of purposeful discrimination. . . . However, once a prima facie case is made out the burden shifts to the prosecution."

Defendant argues, "A fortiori, upon presentation of the motion to discharge the jury, by the defendant in the case at bar, a prima facie case was made out and the burden shifted to the prosecution to offer proof that Negroes had not been systematically excluded from the second jury panel selected for voir dire examination. The prosecution having failed to meet this burden, it must be accepted that Negroes were systematically excluded from the jury and the judgments should be reversed."

The State argues, "The panel of prospective jurors was brought up to the courtroom on April 18, 1966. They were not sworn or even talked to. They sat around until 4 p. m. because counsel and the court were engaged in a pretrial conference. The judge dismissed them and sent them home. Two days later, on the afternoon of April 20, 1966, the court requested a panel. This was a new

412

panel. There was no possible reason to have kept the first panel intact and unused for two days since they had not been sworn or used in any way. The pool of jurors from which the first panel was drawn is the same pool which supplies ten other criminal courts with jury panels. It would be impractical to keep that panel from being open to selection in another court during the intervening two days. The evil purposes attributed to the new panel have no basis in fact or fantasy."

The brief of the State also includes a detailed description and discussion of the jury selection plan in Cook County, which we have not considered because it is not properly a part of this record and does not come within statutory requirements for judicial notice.

The State's authorities on the issue of jury selection include Swain v. Alabama, 380 US 202 (1964), where it is said (p 208):

> "But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. . . . Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation.' "

In Akins v. Texas, 325 US 398 (1944), the court stated (p 403):

> "Fairness in selection has never been held to require proportional representation of races upon a jury."

In Thiel v. Southern Pacific Co., 328 US 217 (1945), the court said (p 220):

"This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible."

In Cassell v. Texas, 339 US 291 (1949), Mr. Justice Frankfurter stated in a separate concurring opinion that:

"Assuming that the grand-jury pool fairly enough reflects the racial composition of the community, there is no basis for a claim of constitutional discrimination if without design it comes to pass that a particular grand jury has no representation of a particular race."

The Cassell case also stated:

" '. . . the Constitution requires only a fair jury selected without regard to race. Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.' 339 US 286, 287, 70 S Ct 631–632. 'Proportional racial limitation is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race.' 339 US 287, 70 S Ct at 632, and 'that representation on the grand jury by race in proportion to population is not permissible for there must be "neither inclusion nor exclusion because of race." ' 339 US 298, 70 S Ct 637."

The State argues that "cases that have been reversed for 'the systematic exclusion of Negroes from the jury' have been instances either where the statute itself evi-

dently discriminated against Negroes or where there was a prima facie case made and showing that no Negro had ever served on Grand or Petit juries and such a showing was unrebutted by the State. Cf. Coleman v. Alabama, 389 US 22, 88 S Ct 2, 19 L Ed2d 22 (1967)."

The Illinois statutory provisions for "drawing, summoning and examining jurors" are set forth in Chapter 78, Jurors, Illinois Revised Statutes. Section 1 provides for "Jury lists—Preparation." The basis for the preparation of jury lists is the "legal voters of each sex of each town or precinct in the county, giving the place of residence of each name on the list, to be known as a jury list." Section 2 provides for "Petit jurors—Selection—Qualifications," and states:

". . . Jurors in all counties in Illinois must have the legal qualifications herein prescribed, and shall be chosen a proportionate number from the residents of each town or precinct, and such persons only as are:

"First—Inhabitants of the town or precinct, not exempt from serving on juries.

"Second—Of the age of 21 years or upwards.

"Third—In the possession of their natural faculties and not infirm or decrepit.

"Fourth—Free from all legal exceptions, of fair character, of approved integrity, of sound judgment, well informed, and who understand the English language."

■ We find nothing in chapter 78 to show that the jury lists are limited in any way on any ethnic or racial basis.

■ We further find that defendant has failed to make out a prima facie case of "systematic exclusion" of Negroes from the instant jury. Defendant offered no evidence to show that the juror panels of April 18 or April 19 were not selected in accordance with the stat-

415

utory provisions of Illinois or not in accordance with the current pronouncements of the United States Supreme Court on "jury selection plans." We note, also, that in the discussion incident to the statement made by the court on this issue, counsel for defendant did not disagree with the court or make any suggestion that the court's version of what happened was not correct. We find no error here.

██ Defendant next contends that, based on the number of complaints on which he was then being tried, he was entitled to twenty peremptory challenges. Chapter 38, section 116-4(e), Illinois Revised Statutes 1965, provided as follows:

> "Each defendant shall be allowed 20 peremptory challenges in capital cases, 10 in all cases in which the punishment may be imprisonment in the penitentiary, and 5 in all other cases. The State shall be allowed the same number of peremptory challenges as all of the defendants."

From the statutory provisions, defendant argues that each complaint constituted a separate case, and defendant should have been permitted an accumulation of challenges for each complaint. The State points out that this issue has recently been resolved by the Supreme Court in People v. Harris, 38 Ill2d 552, 232 NE2d 721 (1967). There, the court said (p 557):

> "In the recent case of People v. West, 80 Ill App2d 59, the appellate court held that a defendant could not cumulate his peremptory challenges under section 115-4(e) and stated: 'We believe that the legislative intent in using the word "cases" was to describe the various types of offenses which would subject the defendant to capital punishment or imprisonment in the penitentiary or other punishment. If the legislature had intended to allow the number of challenges to correspond to the number of indict-

416

ments being tried, it would have used the word "indictments" or "offenses." ' (80 Ill App2d 59, 64.) After the decision in the West case, section 115–4(e) was amended and now provides, 'If several charges against a defendant or defendants are consolidated for trial, each defendant shall be allowed peremptory challenges upon one charge only, which single charge shall be the charge against the defendant authorizing the greatest maximum penalty.' Ill Rev Stats 1967, c 38, par 115–4.

"The legislative intent that the number of peremptory challenges authorized in section 115–4(e) should apply to each defendant in a single case, and not to each defendant on each indictment in the case, seems clear enough from the language used prior to amendment as the appellate court held in West. The amendment, of course, removes any doubt as to the legislative intent."

These pronouncements apply here. The four complaints against defendant were consolidated for trial, and the trial court was correct in ruling that defendant was entitled to five peremptory challenges only.

█ Defendant next contends that the trial court improperly denied defendant's motion to excuse juror Westbrook for cause, because she stated she did not believe in demonstrations. Defendant had previously exhausted his five peremptory challenges. The State argues that juror Westbrook did not indicate a preconceived opinion of defendant's guilt or innocence. The examination of the juror included the following:

"Q. [Mr. Micheletto] Could you receive the evidence with an open mind?
"A. Yes.
"Q. Do you feel you could follow the law as it is given to you regardless of what you think it should be or what it is?

■■■■■■■■■

"A. Yes.
"Q. Will you arrive at a verdict based upon the evidence free from prejudice and sympathy?
"A. Yes."

Defendant's authorities on this contention include People v. Cravens, 375 Ill 495, 31 NE2d 938 (1941), where the court said (p 497):

> "A juror, to be qualified, must come into the trial of the case with a mind uncommitted on the question of guilt or innocence of the defendant and prepared to weigh the evidence impartially. If the existence of certain facts has been established in his mind, touching the guilt or innocence of the accused, to the extent of producing a conviction, he is disqualified, for neither party to the proceeding should be required to adduce proof to remove a preconceived opinion. Such would result in the trial before a juror who had prejudged the case. Such a trial is a mockery. . . . It was a cardinal rule at common law that jurors, to be qualified as impartial, should stand indifferent between the parties and be wholly free from even the suspicion of bias. This must be so if the constitutional guaranty of trial by an impartial jury is to be had."

The State cites People v. Harris, 38 Ill2d 552, 232 NE2d 721, where the court stated (p 556):

> "If a juror meets the statutory qualifications, the determination of whether a challenge for cause should be allowed rests within the sound discretion of the trial court and his ruling will not be disturbed unless he has clearly abused his discretion. (ILP, Juries, § 101.) A reading of the voir dire examination convinces us that the trial court did not abuse his discretion in finding Owen to be an impartial juror."

418

The record indicates that the trial court permitted an extensive voir dire examination of the jurors. We are not convinced that the trial court abused its discretion in the denial of defendant's motion to remove Mrs. Westbrook for cause. We find no error here.

Defendant's final contention of prejudicial error is directed toward the testimony of the last witness offered by the State, a courtroom clerk who testified that he saw the defendant in the courtroom on that day (April 22) at about 2 o'clock in the afternoon. This testimony was admitted over defendant's objection.

Defendant argues that "any testimony or comment in the presence of a jury calling attention to defendant's absence from his trial . . . invalidates the statutory right of the defendant to waive his right to be present during the conduct of his trial." (Ill Rev Stats, c 38, §§ 115-3 and 115-4(h).) Defendant further argues that the testimony of the courtroom clerk "was improper, incompetent and prejudicial because it had the effect of compelling the defendant-appellant to give evidence against himself. Such testimony is an admission by silence. Admissions by silence have been rejected as evidence by the United States Supreme Court, Miranda v. Arizona, 384 US 436." Also cited is People v. Fuerback, 66 Ill App2d 452, 214 NE2d 330 (1966), where the court held it reversible error for the State in closing argument to refer to defendant's waiver of an opening statement. Defendant asserts that the presence or absence of defendant at his trial was not proper evidence, and testimony relative thereto had no probative value or relevancy and was highly prejudicial so as to deprive defendant of a fair trial.

The State argues, "The defendant absented himself from the proceedings during the entire course of the trial. The defendant undoubtedly has a right to a fair trial. However, this is a two way street with the People being entitled to a fair trial also. The defendant has

neither the right to impede a trial or cast any innuendo as to the reason for his being absent. It would not be fair for a jury to believe that the People were in any way responsible for the defendant's absence. The testimony admitted merely showed that the defendant had been present before the proceedings of the day started. The jury could then conclude that the defendant's absence was of his own choice." In support, the State cites People v. Harris, 302 Ill 590, 135 NE 75 (1922).

 We find no merit in the argument of the State on this point. Defendant had a right to waive his right to be present during the conduct of his trial, and his presence or absence at any time was not a matter for comment or evidence by the State. Defendant's continued absence from the courtroom must have been obvious to the jury during the trial. Also, defendant's counsel stated several times in open court and before the jury that the defendant stood mute. Although we consider the testimony of the court clerk was improperly admitted, we fail to see that it was prejudicial to defendant so as to deprive him of a fair trial.

For the reasons stated, the judgments of the Circuit Court of Cook County are affirmed.

Affirmed.

BURMAN, P. J. and ADESKO, J., concur.