102 N.J. Super. 325 (1968)
246 A.2d 35
THE STATE OF NEW JERSEY, PLAINTIFF,
v.
JOHN WILLIAM SMITH, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided June 28, 1968.
*330 Mr. Andrew F. Zazzali, Jr., Assistant Prosecutor for plaintiff, State of New Jersey (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
Mr. Harris David and Mr. Mark Gasarch for defendants (Mr. Oliver Lofton, Director, Newark Legal Services Project, attorney).
*331 GIULIANO, A.J.S.C.
This is a consolidated motion to dismiss 98 indictments returned by the 15th and 16th Grand Juries of the September 1966 term sitting during the May 1967 session.
On September 29, 1967 defendant John William Smith filed with the court a motion to dismiss two indictments returned against him by the Essex County grand jury. Each indictment charged him with assault and battery upon a police officer, contrary to the provisions of N.J.S. 2A:90-4. Thereafter, approximately 94 other defendants filed similar motions to dismiss the indictments returned against them by an Essex County grand jury. All the aforesaid indictments involved defendants arrested during the civil disturbance which occurred in Newark, New Jersey, during the month of July 1967. Since all the motions in question involve common questions of law and fact, this court ordered that this matter be consolidated for purposes of argument, presentation and findings. A stipulation to this effect was signed by all defense attorneys and filed with the court on October 10, 1967.
In order that there would be no delay in the disposition of these indictments, the court ordered at the first hearing that all indictments returned against defendants would proceed to trial. Since the filing of this motion, the indictments returned against defendant John William Smith have been disposed of by trial. A jury returned a verdict of guilty on indictment 2678-66 and were in disagreement on indictment 2679-66. Of the remaining indictments, 71 were dismissed on motion of the Essex County Prosecutor, and most of the defendants in this group were charged with a lesser offense under the Disorderly Persons Act. In addition, 16 defendants were tried, convicted and sentenced, 6 were tried and found not guilty, and 1 failed to appear in court and a bench warrant was issued for his arrest. The remaining indictments have not been disposed of at this time.
This motion presents basically four issues concerning (1) the loyalty oath of grand and petit jurors; (2) the lack of a *332 transcript of the grand jury proceedings; (3) the conduct of the grand jury in deliberating and voting on the indictments in question, and (4) the composition and selection of grand and petit juries. Each issue is discussed in detail under its appropriate heading.

THE OATH OF THE GRAND AND PETIT JURORS
The grand jurors who indicted defendants were required to take an oath pursuant to N.J.S. 2A:73-3. This oath provided in pertinent part as follows:
"* * * you do not believe in, advocate or advise the use of force, or violence, or other unlawful or unconstitutional means, to overthrow or make any change in the government established in the United States or in this State; and that you are not a member of or affiliated with any organization, association, party, group or combination of persons, which so approves, advocates, or advises the use of such means * * *."
Petit jurors are required to take a similar oath as provided in N.J.S. 2A:69-1.1
Defendants contend that this oath is violative of the Fifth and Fourteenth Amendments to the United States Constitution because it requires neither specific intent to subvert or active membership in subversive groups. Furthermore, they contend that the requirement of this oath causes an unconstitutional exclusion from jury service of those persons who believe in the unlawful overthrow of our government or persons who are inactive members of a subversive organization. Defendants have submitted other arguments in support of this contention, but this court finds them without merit in law and fact. In particular, defendants contend that the oath denies them the right to be indicted by a grand jury which is constituted in accordance with the Fourteenth Amendment to the Constitution of the United States. The "due process" clause does not require the states to adopt the grand jury system. Lem Woon v. State of Oregon, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed. 1340 (1912). Furthermore, a state may abolish grand juries without violating the Fourteenth Amendment. Hurtado v. People of State of *333 California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232 (1883). A fortiori, a state has considerable latitude in the type of grand jury system it may establish.
In addition, defendants contend in their moving papers that the oath created "an effect of instilling in the minds and consciences of the grand jurors * * * a disregard of the Constitution of the United States." How this "effect" resulted was not explained to the court. Finally, defendants argue that the oath, coupled with the court's charge to the grand jury and certain alleged inflammatory statements by public officials, prejudiced them. As to this argument defendants failed to show how they were prejudiced and did not support this position with accurate authority. Therefore, these contentions were not considered by the court.
On oral argument of this matter counsel stipulated that no defendant is a member of the class of persons allegedly excluded by the oath, i.e., persons who believe in the unlawful overthrow of our government or persons who are inactive members of a subversive organization. In addition, there was no evidence presented to this court that any member of the grand jury which indicted defendants refused to take the required oath and was thereby excluded from jury service. These facts present the question of whether defendants have standing to challenge the constitutionality of the oaths. Defendants' position is that they have standing to challenge the oath because of its chilling effect on the First Amendment rights of free speech, press, assembly and belief. Thus, they contend they do not have to show prejudice because the oath results in an illegal discrimination and exclusion.
Under the present state of the law as espoused by the United States Supreme Court, a federal court has "never entertained a defendant's objection to exclusions from the jury except when he was a member of the excluded class." Fay v. People of State of New York, 332 U.S. 261, 287, 67 S.Ct. 1613, 1627, 91 L.Ed. 2043 (1947); Rawlins v. State of Georgia, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906). The apparent rationale for this rule is that if a *334 defendant is a member of the excluded class, the danger of prejudice is great enough for a court to hold that the exclusion is unconstitutional without a showing of actual prejudice. However, if a defendant is not a member of the excluded group, the danger of prejudice is not great. Therefore, before the court will hold the exclusion unconstitutional as to a defendant, it must find that he was actually prejudiced thereby.
This doctrine of standing has been followed in several states. See State v. Lea, 228 La. 724, 84 So.2d 169, 170 (Sup. Ct. 1955); People v. White, 43 Cal.2d 740, 278 P.2d 9, 17 (Sup. Ct. 1954), certiorari denied 350 U.S. 875, 76 S.Ct. 120, 100 L.Ed. 774 (1956); Griffin v. State, 183 Ga. 775, 190 S.E. 2 (Sup. Ct. 1937); Haraway v. State, 203 Ark. 912, 159 S.W.2d 733 (Sup. Ct. 1942), certiorari denied 317 U.S. 648, 63 S.Ct. 42, 87 L.Ed. 521 (1942); State v. Koritz, 227 N.C. 552, 43 S.E.2d 77 (Sup Ct. 1947), certiorari denied 332 U.S. 768, 68 S.Ct. 80, 92 L.Ed. 354 (1947); State v. Jones, 5 Terry 372, 44 Del. 372, 57 A.2d 109, 113 (Del. O. & T. 1947); Commonwealth v. Duca, 312 Pa. 101, 165 A. 825 (Sup. Ct. 1933); State v. Clifton, 247 La. 495, 172 So.2d 657 (Sup. Ct. 1965). Likewise, this doctrine is the procedural law of New Jersey. State v. James, 96 N.J.L. 132, 144 (E. & A. 1921). See also State v. Lee, 74 N.J.L. 852 (E. & A. 1905), affirmed 207 U.S. 67, 28 S.Ct. 22, 52 L.Ed. 106 (1907). The James case involved a situation in which women were allegedly excluded from the jury panel by the jury commissioners. The Court of Errors and Appeals held that defendant could not raise the question that the exclusion of women from jury duty violated the Fourteenth Amendment to the United States Constitution because he was not a member of the alleged excluded class. Likewise, in the case at bar defendants cannot raise the question of exclusion because none of them is a member of the excluded class.
On the other hand, defendants contend they need not show actual prejudice by the application of the law or *335 that they are members of the allegedly excluded class, and rely on Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). In both these decisions the United States Supreme Court acted in the exercise of its power of supervision over the administration of justice in the federal courts. The question of standing in a state court is to be determined by state law. In addition, defendants rely heavily on the case of State v. Madison, 240 Md. 265, 213 A.2d 880 (1965), wherein the Maryland Supreme Court held that the selection of a grand jury from persons who were required to show their belief in the existence of God was violative of the Federal Constitution. Although the defendant in Madison was not a member of the excluded class, i.e., he was a believer in a Supreme Being, the Maryland court maintained that he still had standing to challenge the aforesaid requirement for jury duty. This court finds that Madison on this procedural point is not binding in the present case and concludes that defendants herein are required to show prejudice before the oaths in question are declared invalid and unconstitutional.
Since defendants have failed to show prejudice and in view of the above-cited cases this court concludes that defendants do not have standing to challenge the constitutionality of N.J.S. 2A:73-3 and N.J.S. 2A:69-1.1.
Assuming, arguendo, that defendants do have standing to challenge those statutes, this court is still constrained to find them constitutional for the following reasons:
Loyalty oaths have long been the subject of litigation. Within the past few years this interest was renewed by the United States Supreme Court regarding loyalty oaths required of teachers. See Keyishian v. Board of Regents of University of State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, *336 12 L.Ed.2d 377 (1964). Keyishian dealt with an oath almost identical to the oath required of grand and petit jurors in the case at bar. The United States Supreme Court held that the oath as applied to teachers was unconstitutionally vague and violative of the First Amendment to the United States Constitution. It is apparent that the court gave special consideration to the "sensitivity" of a teacher's position in the academic community. The court, through Mr. Justice Brennan, said:
"Our nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." (385 U.S., at p. 603, 87 S.Ct., at p. 683)
See also Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).
Therefore, this Court must consider whether jurors are also to be given this special consideration. In doing so the court must weigh the State's interest in having loyal jurors against First Amendment rights.
Juries, in particular grand juries, have always been considered an arm of the court; they perform a quasi-judicial function in our present judicial structure. In re Jeck, 26 N.J. Super. 514 (App. Div. 1953). As provided in R.R. 3:3-1 et seq., it is the specific function of the grand jury to find and return an indictment or presentment in open court to the assignment judge. In so doing the grand jury must accept the law as it is written; otherwise the criminal laws would be virtually unenforceable. Likewise, the petit jury must accept the law as it is charged to them by the trial judge; otherwise their findings would be inconsistent and chaotic. Therefore, in order for the jury system to function, jurors themselves must be loyal to the government and the laws which it promulgates.
When considering the above it becomes apparent that the real interest of the State is in its right to self-preservation. *337 For if the jury fails to function properly and condones criminal acts, anarchy and lawlessness are sure to result and the jury system itself would be destroyed. This court therefore finds that the State's interest of self-preservation necessitates a limitation on First Amendment freedoms in this particular area of our governmental structure. Limitations on First Amendment Freedoms have been deemed lawful and necessary in similar situations where the State's interest was declared supreme. See, for example, American Communications Ass'n v. Dowds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); In re Application of Marvin, 97 N.J. Super. 62 (App. Div. 1967). Therefore, if this issue were properly presented, this court would conclude that the oath required of grand and petit jurors is constitutional and not an unreasonable restriction of First Amendment freedoms.

TRANSCRIPT OF THE GRAND JURY PROCEEDINGS
There was no stenographic record made of the grand jury proceedings which resulted in the indictment of defendants. Movants contend that the failure to make a stenographic record or otherwise record these proceedings has deprived defendants of their rights contemplated by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. They are unable to cite law in support of this contention.
The present state of the law in the federal courts is that "There is no constitutional requirement that grand jury proceedings be transcribed." United States v. Cianchetti, 315 F.2d 584, 591 (2 Cir. 1963). See also United States v. Hensley, 374 F.2d 341 (6 Cir. 1967); McCaffrey v. United States, 372 F.2d 482 (10 Cir. 1967). The attendance of a stenographer at a grand jury proceeding in the federal courts is permissive rather than mandatory. United States v. Borys, 169 F. Supp. 366, 368 (D. Alaska 1959); United States v. Rosen, 259 F. Supp. 942 (S.D.N.Y. 1966).
*338 The law of this State is in accord with the above-cited cases. The presence of a stenographer and the recording of testimony adduced before the grand jury is clearly of a permissive nature. State v. DiModica, 40 N.J. 404, 412 (1963). Although R.R. 3:3-6 now provides otherwise, this court is compelled to hold that the failure to provide a stenographic record of the grand jury proceedings did not violate any of the constitutional rights of defendants.

THE GRAND JURY PROCEEDINGS
The third major contention of defendants involves alleged misconduct on the part of the 15th and 16th Grand juries and the Court, allegedly resulting in a denial of their rights as guaranteed to them under the Fifth and Fourteenth Amendments to the United States Constitution and N.J. Const. (1947), Art. I, Par. 8, and in violation of N.J.S. 2A:73-3 which sets forth the oath and duties of the grand jurors. More specifically, defendants contend they were denied the right to an indictment by an impartial grand jury because (1) the grand jury was prejudiced against defendants by the adverse publicity surrounding the Newark civil disturbance; (2) the charge by the court to the grand jury was biased against defendants; (3) the grand jury spent insufficient time deliberating on each indictment, and (4) the court failed to inquire of grand jurors regarding the possibility of their being prejudiced against defendants.
There is no doubt that the Newark civil disturbance and the similar outbreaks of lawlessness which occurred throughout the country during the summer of 1967 received nationwide publicity. Likewise, there is no question that certain public officials made statements condemning the numerous criminal activities which occurred spontaneously at that time. Thus, the question presented is whether this publicity so adversely affected the grand juries which indicted defendants that it caused a violation of due process of law.
*339 In support of this contention that the grand jury was prejudiced against them by the publicity surrounding the Newark disturbances, defendants cite numerous cases regarding a fair trial and free press. These cases are not applicable to the case at bar because they concern themselves with the trial of the case and not the indictment process itself. Furthermore, this line of cases condemns as unconstitutional those situations wherein the trial itself was conducted in a "carnival atmosphere", thereby creating the probability of prejudice abhorent to due process of law. Sheppard v. Maxwell, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). See also Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Turner v. State of Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).
The proceedings of the grand jury are presumed valid unless proof is submitted to the court which rebuts this presumption. State v. Graziani, 60 N.J. Super. 1 (App. Div. 1959), affirmed 31 N.J. 538 (1960). In the case at bar there has been no indication to the court that the grand jury proceedings in question were not conducted in the usual solemn manner. Likewise, there has been no evidence presented to the court that any indictment involved herein was the result of bias, prejudice or malice as was condemned in the case of State v. Borg, 9 N.J. Misc. 59 (Sup. Ct. 1931). On the contrary, the news media merely reported the Newark civil disturbances as accurately as possible under the circumstances. The fact of news publicity alone cannot be said to have created such a "probability of prejudice" that the grand jury proceedings should be deemed "inherently lacking in due process." See Estes v. State of Texas, supra, 381 U.S., at pp. 542-543, 85 S.Ct. 1628. The court therefore finds that defendants were in no way prejudiced by the publicity surrounding the Newark Civil disturbance.
Defendants further contend that the language of the charge by the court to the 15th and 16th grand juries was *340 biased against defendants. This contention is not supported by any accurate authority. Those portions of the charge claimed objectionable are as follows:
"The Court has requested that you appear before it this morning to be charged and instructed relative to the many killings, serious injuries inflicted upon individuals, the burning and destruction of personal property, the plundering and looting of business establishments and general lawless and riotous conduct by many individuals * * *. There is no doubt that certain guarantees and protections cloak all citizens under the Federal and State Constitutions, but these constitutional rights were never meant to be shields for acts of criminality. They were never intended to be licenses for burning, shooting, looting, plundering and murder. * * *
Certain events have taken place in the City of Newark which demand your immediate attention and consideration. I do not have to remind you of the complete disregard for law and order that has been hovering over this municipality. Facts which have come to the attention of the Court indicate a pattern of lawlessness which cannot be permitted to go unnoticed by those charged with the administration of justice * * *"
It is well established in our system of jurisprudence that the grand jury performs a two-fold function. It acts as a sword so that those who are suspect of wrongdoing may be properly brought to trial, and as a shield to protect the people from arbitrary prosecution. State v. Sibilia, 88 N.J. Super. 546, 550 (Cty. Ct. 1965). In conformance therewith the court charged each grand jury that it was the duty of the grand jury to return an indictment in each instance where the State had presented a prima facie case with "due process as the beacon." Likewise, the court charged that where the State failed to present a prima facie case it was equally the grand jury's duty not to indict. The court further charged that
"You should without fear or favor, prejudice or symphathy examine the evidence presented to you in each case and determine whether or not it merits your returning an indictment against the accused."
When this charge is considered in its totality, this court concludes it did not prejudice defendants, for the *341 charge was in no way whatsoever directed as an attack at any individual or class of persons. The charge merely pointed out that certain acts of lawlessness had occurred in Essex County and as a result thereof each grand jury was summoned to investigate the matter and act in accordance with their oaths.
Defendants further contend that the 15th and 16th grand juries spent insufficient time deliberating on each case presented to them before returning an indictment, thereby resulting in a violation of the grand jurors' oath as set forth in N.J.S. 2A:73-3. This argument is unfounded in fact and law. The 15th grand jury heard cases resulting from the Newark civil disturbances for a period of nine full days. Out of the 386 cases presented to them by the Essex County Prosecutor's Office, 331 true bills were returned to the assignment judge and 55 no bills were found. The 16th Grand Jury heard similar cases for a period of seven full days. Out of the 267 cases presented to this grand jury, 225 true bills were returned to the assignment judge and 42 no bills were found. In every case where an indictment was returned, one or more witnesses appeared and testified before the grand jury. Furthermore, there was sufficient evidence presented to this court to indicate that the grand juries deliberated and voted accordingly on each and every case presented to them. Although cases were presented to those grand juries by the prosecutor's office with dispatch, there was no evidence in the record to indicate any unlawful practice or procedure. This court therefore concludes that the 15th and 16th grand juries spent sufficient time deliberating and voting on each case presented to them.
After these indictments were returned, many were dismissed by the court on the prosecutor's motion after an amended or new complaint was filed charging the accused with a lesser offense under the Disorderly Persons Act. This procedure is commonly referred to as "downgrading" an indictment. It is employed by the prosecutor only after he has considered the circumstances of the offense charged, the *342 status of the defendant, and whether the best interests of justice will be served by charging the accused with the lesser offense. If the facts warrant, the charge is downgraded. In the past this procedure has proved an effective device for disposing of criminal cases as well as protecting the accused and society. However, it is defendants' contention that the use of this procedure in the instant case was an indicia of misconduct on the part of the 15th and 16th grand juries. This court does not agree with this argument, for the sole question presented in downgrading an offense is whether, after considering the facts of the particular case, the best interests of justice will be served by charging the accused with a lesser offense. Downgrading an offense does not depend upon the weight of the evidence. Therefore, the mere fact that several cases were "downgraded" does not permit this court to infer that in those cases there was insufficient evidence before a grand jury to indict the accused.
Under the present state of the law, grand jury proceedings are generally considered secret. State v. DiModica, 40 N.J. 404 (1963). The reasons for grand jury secrecy were aptly stated in the case of United States v. Rose, 215 F.2d 617, 628-629 (3 Cir. 1954):
"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."
(Quoted in State v. DiModica, supra, 40 N.J., at pp. 409-410, and State v. Clement, 40 N.J. 139-143 (1963))
This veil of secrecy may be lifted when the Court is satisfied under the circumstances of a particular case that the policy *343 of secrecy should be subordinate to the search for the whole truth. State v. Farmer, 48 N.J. 145, 152 (1966).
Since defendants charged the grand juries with serious misconduct, the Court permitted defendants to inquire as to whether there was some legal evidence before each grand jury to support a return of the indictments in question and whether each grand jury spent sufficient time deliberating on each case. This is permissible under the law. See State v. Donovan, 129 N.J.L. 478, 483 (Sup. Ct. 1943). However, this court refused to allow defendants to inquire as to the competency and adequacy of evidence before the grand jury. This is not required by the Fifth Amendment to the United States Constitution. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Furthermore, to hold otherwise would create undue delay in the trial of criminal cases because the court would have to conduct a preliminary hearing in each case to determine the competency and adequacy of the evidence before the grand jury. As indicated heretofore, there was legal evidence presented to the grand jury in each case where an indictment was returned to the court. Therefore, this court concludes that there was no misconduct on the part of the 15th and 16th grand juries.
Defendants' final contention on this point is that the court was in error for failing to inquire of each grand juror regarding the possibility of prejudice against defendants or members of their class. This argument presents the question whether the court has the duty and responsibility to make such an extensive inquiry of prospective grand jurors. There is no case law or statute which imposes this duty upon the court. At present it is sufficient that the court instruct grand jurors to decide each case on the merits and "without fear or favor, prejudice or sympathy, examine the evidence presented * * * in each case and determine whether or not it merits your returning an indictment against the accused." In addition, grand jurors are required to take an oath *344 pursuant to N.J.S. 2A:73-3, which provides in pertinent part:
"* * * that you shall diligently inquire * * * that you shall present no one through envy, hatred or malice; neither shall you leave anyone unpresented for fear, favor or affection, for reward, gain or the hope thereof * * *"
In view of the above procedures this court concludes that the charge, coupled with the required oath, is sufficient to preclude the possibility of prejudice on the part of the grand jury. The court therefore is under no obligation to question grand jurors regarding the possibility of their being prejudiced against a prospective defendant or class of defendants.

THE COMPOSITION OF THE GRAND AND PETIT JURIES
The defendants' final contention is that the grand and petit juries were improperly and unconstitutionally impaneled. In particular, defendants claim that the procedure employed by the Essex County jury commissioners in the selection of grand and petit jurors resulted in a systematic and deliberate exclusion of Negroes, women, residents of the City of Newark, and persons of lower economic status. Defendants submit that this alleged discrimination deprived them of their rights to an indictment constitutionally found and to trial by jury in accordance with the Fifth and Fourteenth Amendments to the Constitution of the United States and N.J. Const. (1947), Art. I, par. 8. Due to the gravity of this claim, the court conducted an extensive hearing commencing October 9, 1967 to determine the veracity of the above claims. The hearing was concluded on March 22, 1968 upon the filing of supplemental briefs requested by the court.
The New Jersey Legislature has entrusted the jury commissioners of each county with the task of obtaining *345 grand and petit jurors with a view to the "just distribution of jury service among those persons qualified therefor in the various wards and municipalities of the county." N.J.S. 2A:70-1. The jury commissioners are guided by N.J.S. 2A:69-1, which provides the qualifications for jury service, and N.J.S. 2A:69-2, which sets forth exemptions from jury service. Jury commissioners are given discretion in the selection of jurors and the courts will not substitute their own formula for that chosen by the jury commissioners in the absence of proof of "bad motive." State v. Biehl, 135 N.J.L. 268, 270 (Sup. Ct. 1947); State v. Grundy, 136 N.J.L. 96 (Sup. Ct. 1947); State v. Stewart, 2 N.J. Super. 15, 21 (App. Div. 1949).
It is a well established principle of our jurisprudence that juries, as instruments of public justice, be truly representative of the community. Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Glassner v. United States, 315 U.S. 60, 85, 62 S.Ct. 457, 86 L.Ed. 680 (1941); State v. Stewart, supra, 2 N.J. Super., at p. 26. Therefore, a deliberate and systematic exclusion from jury service of Negroes or any other qualified class of persons constitutes a deprivation of equal protection under the Fourteenth Amendment to the Constitution of the United States. Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Neal v. State of Delaware, 103 U.S. 370, 26 L.Ed. 567 (1880); Rogers v. State of Alabama, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1903); Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947). However, this principle cannot be taken to mean that an accused is entitled to have one or more persons of his race or class on the jury panel, for it is equally well settled that the accused only has a right to a jury selected without discrimination or bias towards any particular race or class. No defendant has the right to have a jury composed in whole, in part, or in proportion to any specific racial, economic or geographical group. Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880).
*346 All jury discrimination cases present a question of fact. In the case at bar this court must determine whether the jury commissioners, through their practices and procedure in selecting jurors, deliberately and systematically excluded Negroes, women, residents of the City of Newark and persons of lower economic status. There is a presumption in favor of the validity of the indictment and panel. The defendant who asserts that there has been discrimination in the selection of the jury panel has the burden of proving it. Martin v. State of Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497 (1905); Akins v. State of Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1944). Once the movant establishes a prima facie case of discrimination, i.e., a significant disparity between those qualified for jury service and those of the group actually on the jury lists, the burden of proof shifts to the prosecution to explain this disparity. Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). However, the indictments should not be dismissed except on the clearest and plainest grounds. Cf. State v. Chandler, 98 N.J. Super. 241, 245 (Cty. Ct. 1967).
This court must now examine the practices and procedures employed by the Essex County jury commissioners and their staff in obtaining grand and petit jurors. Since the procedure of selecting grand and petit jurors differ, they shall be dealt with separately.
Names of prospective grand jurors are obtained by the jury commissioners, who solicit such names from various civic organizations, churches, labor unions, phone books and various other organizations including the National Association for the Advancement of Colored People. This system is commonly referred to as the "key-man" system. Although this system is somewhat outmoded, this court has found no case declaring it to be unconstitutional per se. After these names are supplied to the jury commissioners they are turned over to their staff who, in turn, send an objective questionnaire to the prospective grand jurors. Form, see *347 R.R. 1:29-2. The questionnaire requests answers to certain questions regarding the prospective juror's background in order that it may be determined whether he is qualified pursuant to N.J.S. 2A:69-1, or exempt from jury service pursuant to N.J.S. 2A:69-2. After the staff, under the supervision of the jury commissioners, makes this determination, the names are placed on the master list. Generally the names supplied by the jury commissioners prove insufficient. In such instances members of the staff, at the direction of the jury commissioners, go to the superintendent of elections office and obtain additional names from the Voter registration list or take names not used in prior lists. Generally, names taken from the voter registration list in this instance are persons residing in Newark. There is no marking to indicate race, color, creed or ethnic background on either the questionnaire, master list, or voter registration list. The grand jury master list usually contains approximately 300 names. The final selection of who will serve on the grand jury is done by drawing 50 of the 300 names from a roll box in open court in the presence of a judge.
Names of prospective petit jurors are taken solely from the voter registration lists of Essex County. The voters' names are on addressograph plates in the office of the superintendent of elections for Essex County. Each plate contains the name, address, district and ward of each registered voter, and the plates are arranged on trays by ward and district, street number first and then alphabetically by name. The voter registration printed lists are made up from the addressograph plates and are arranged in the same manner as the plates. Since 1966 the staff, at the direction of the jury commissioners, has prepared petit jury lists by selecting names in a given alphabet range from the addressograph plates. For example, in 1967-1968 the jury commissioners' staff authorized the use of the letters M to R in preparing the petit jury panels. The staff went through the plates and sought the names beginning with those letters. They then placed each name on a standard questionnaire and a blank card. If a *348 large family of registered voters appeared on the plates, only two names would be chosen without regard to sex. The questionnaire was then mailed to the prospective juror after the staff checked the name against the city directory to determine if the prospective juror had an excludable occupation. If so, the questionnaire was not mailed. The blank cards were retained by the staff as a record indicating to whom questionnaires were sent. Prior to 1966 the printed voter registration list rather than the addressograph plates were employed for this purpose.
Approximately 35,000 questionnaires are mailed out to prospective petit jurors in the various wards and municipalities of the county at the beginning of each year.[1] The number of questionnaires mailed annually varies in accordance with the needs of the court for petit jurors. Out of this total number, approximately 3,000 questionnaires are returned "Address Unknown", and an additional 15% of the total number mailed receive no response. The majority of these questionnaires returned "Address Unknown", or those which receive no response are addressed to Newark residents. Questionnaires which are returned are reviewed by the staff with the approval of the jury commissioners. Those persons who do not qualify or are exempt from jury service are not placed on the list. The names of those persons who do qualify are placed on IBM cards and then into a computer *349 which sorts and shuffles the cards at the request of and in the presence of the court and jury commissioners and produces the names of persons selected as jurors.
The procedure heretofore discussed is unlike any procedure condemned as unconstitutional by our federal courts. For example, in Whitus v. Georgia, supra, prospective jurors' names were chosen from a tax digest on which a "C" was placed after every Negro name. In addition, there was a significant disparity between the percentage of Negroes on the tax digest (27.1%) and that on the grand jury venire (9.1%) and the petit jury venire (7.8%) which strongly pointed to a conclusion of discrimination. Likewise, in Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953), not only was the source of prospective jurors' names maintained on a racially segregated basis, but also the names of prospective Negro jurors were placed in the jury box on yellow colored tickets. In both the aforesaid cases, it was primarily the procedure employed in selecting jurors that pointed to the conclusion of discrimination. See also Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935).
There are several other cases in which a long and continued absence of Negroes on the jury lists brought the court to a conclusion of discrimination. See, for example, *350 Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Patton v. State of Mississippi, supra. The case at bar differs from both of these situations. There was no direct evidence presented to the Court which indicated that the jury commissioners or their staff deliberately and systematically excluded Negroes from the jury panels. Likewise there was no marking as to race, color or ethnic background on the source from which names were obtained, i.e., the voter registration lists, addressograph plates of registered voters, printed list of registered voters or master list. The only questionable practice is the "key-man" system, which involved the partial selection of grand jurors from community sources by the jury commissioners. However, even in this instance there was no indication of discrimination for the names were solicited by the jury commissioners from varied sources, including Negro and labor organizations. Likewise, the names so supplied to the commissioners were not earmarked by race or otherwise. In addition, there has been no continued absence of Negroes on our grand and petit juries. On the contrary, there was ample testimony in the case at bar that there has always been Negro representation on the grand jury panels. In fact, there were three Negroes on the 15th grand jury and one Negro on the 16th. This court therefore concludes that the practices and procedures employed by the jury commissioners in the selection of grand and petit jurors is not violative of the Federal Constitution nor does such procedure point to a conclusion of discrimination towards any race or class of individuals.
Since there is nothing unconstitutional about the jury selection procedure per se, the next question presented is whether there is such significant under-representation on the jury lists of Negroes, women, residents of the City of Newark and persons of lower economic status as would strongly point to a conclusion of discrimination. If so, there is the further question whether such under-representation establishes a prima facie case of discrimination, thereby rebutting the presumption of validity of the jury panels and shifting the *351 burden of proof to the prosecution to explain the disparity. See Whitus v. Georgia, supra, 385 U.S., at p. 550, 87 S.Ct. 643.
During the hearing heretofore mentioned, the composition of the grand and petit juries was determined by the use of statistics and what is commonly called a "random sample technique." For the purpose of determining the composition of the grand jury, this court considered the four past grand jury master lists, i.e., from May 1966 to May 1967. The lists totalled 1,200 names and defendants used a sample of 300 names to determine race, sex, residence and occupational background of the jury panels. The sample indicated that of the names on the grand jury master list, 25.0% were female (21.8% by actual count), 26.7% were residents of Newark (26.9% by actual count), and 6% were Negro (by sample only). The average occupational breakdown on the aforesaid grand jury lists was approximately 39% professional, 16% manager, 9% clerical, 9% sales, 2% craftman, 2% operative, 2% household, 1.5% laborer, .5% unemployed, 7.5% housewife, 11% retired, and .5% self-employed. The largest classification was "professional" and included over 100 professions or occupations.
According to the population statistics furnished by defendants, the breakdown of the Essex County population between the age of 21 and 74 years indicates that 52.2% are female, 41.7% of the county population reside in Newark, and 17% of the county population are Negro.
The occupational breakdown of the Essex County labor force is as follows: professional 11.55%, manager 8.20%, clerical 16.47%, sales 7.41%, craftman 11.56%, operative 20.19%, household 9.93%, laborer 4.03%, unemployed 2.51%, housewife (not considered in labor force), retired (not considered in labor force), and self-employed 8.15%. There were no statistics introduced in evidence to indicate the number of persons qualified for jury service in any of the aforesaid classifications. For example, there was no evidence to indicate the number of persons classified in "craftman" who *352 were eligible or qualified for jury service. There was no evidence presented to indicate to this court the percentage of those persons in each class who were not qualified for jury service or were exempt from it. In addition, there were no statistics presented to the court to indicate the percentage of persons in each class who were or were not registered to vote in the County of Essex. There is a probable inference that the composition of the grand jury panels was a result of the legitimate application of statutory standards of qualifications and exemptions. Thus, if this court were to find discrimination in the case at bar based solely on the aforesaid statistics, that conclusion would be founded on mere conjecture and speculation. Furthermore, to expect the jury commissioners to provide a perfectly balanced jury list would be to impose an Herculean task upon them. This court therefore concludes that there is insufficient evidence to support a prima facie case of discrimination in the selection of the grand jury panels.
Additional evidence was introduced to indicate the probability of observing the present composition of the grand jury. For example, defendants' statistician testified that assuming Negroes between the ages of 21 and 74 years comprise 17% of the Essex County population, the probability of observing 6% or less Negroes on a given grand jury list is less than one in a million. The same statistician also testified that he would expect to find on a grand jury master list of 300 names, 12.7% to 21.3% Negroes 95% of the time. The court is not impressed with these statistics because defendants' statistician admittedly did not consider all of the qualifications for jury service or exemptions from jury service. Namely, defendants' statistician did not consider the percentage of Negroes, women, residents of Newark and persons of lower economic status between the ages of 21 and 74 years who were disqualified from jury service because they were: (1) not a resident of this State for at least two years; or (2) not a resident of Essex County; or (3) convicted of a crime, or (4) not able to read, write and understand the *353 English language; or (5) they had a mental or physical disability which would prevent them from properly serving as jurors. N.J.S. 2A:69-1. Likewise, defendants' statistician did not consider the percentage of persons in each of the aforesaid groups who would be exempt from jury service by virtue of the fact that they were: (1) a member or employee of a police force or fire department, or (2) a member of the state or federal military forces, or (3) employed as a school teacher, or (4) entrusted with the care and custody of a minor child and jury service would interfere with the care required of such child. N.J.S. 2A:69-2. These factors would significantly decrease the number of qualified persons in each of the aforesaid groups. Therefore, since the validity of these statistics is so tenuous, this court finds them inconsequential on this motion. The application of mathematical techniques in the proof of facts of a criminal case should be approached with caution and restraint. See People v. Collins, 66 Cal. Rptr. 497, 438 P.2d 33 (Cal. Sup. Ct. 1968); but see "The Application of Statistical Decision Theory to the Jury Discrimination Cases," Harv. L. Rev. 338.
This court now turns to the composition of the petit jury. It has considered the four petit jury master lists for May 1966 to May 1967 consisting of approximately 18,000 names, Since the voter registration lists are the source for the petit jury lists, it is incumbent upon this court to know the composition of those lists. If a particular group of persons fails to register to vote, it is not the result of discrimination that the particular group is not represented on the jury panels. The evidence indicates that in 1967 53.9% of the voters registered in Essex County were women and 33.3% of all voters residents of Newark. There was no evidence introduced to indicate the number of Negroes registered to vote in this county or the number of registered voters in each of the occupational classifications heretofore discussed in the selection of the grand jury.
A review of the record indicates that out of all the questionnaires mailed for the 1966 lists, 26.3% were sent *354 to women, and for the 1967 lists, 26.1% were sent to women. The resulting average of women on the four petit jury lists was 22.7%. The apparent cause of this disparity is two-fold. First of all, N.J.S. 2A:69-2(g) provides that
"Any person who has the actual physical care and custody of a minor child and who gives written notice to the jury commissioners of the county of his residence that jury service would interfere with the care required for such child shall be exempt * * *."
Naturally, many more women than men fall into this category of exemption, thereby explaining the imbalance. Furthermore, where a family's name appears on the voter registration lists, the jury commissioners' staff would only choose one or two members of that family to serve on jury duty. In many instances the male name was chosen to alleviate the burden of service on women entrusted with the care of minor children. Although a disparity resulted by use of the aforesaid procedure, this court cannot dismiss the indictments on this ground in the absence of showing that the jury commissioners were arbitrary or deliberate in their exclusion of women from the jury lists, or that their action was probably harmful to defendants' substantive rights. Butler v. State, 229 N.E.2d 471 (Ind. Sup. Ct. 1967).
N.J.S. 2A:70-1 provides in pertinent part that the jury commissioners are to prepare grand and petit jury lists with a due regard to "the just distribution of jury service among those persons qualified therefor in the various wards and municipalities of such county." In compliance therewith the jury commissioners sent questionnaires for jury service to residents of every municipality in the county.[2] Of the total questionnaires sent to prepare the 1966 petit jury lists, 28.2% were sent to Newark residents. Of the total questionnaries sent to prepare the 1967 petit jury lists, 31.2% were sent to *355 Newark residents.[3] The approximate percentage of Essex County Voters residing in Newark in 1966 was 34.7% and in 1967 was 33.3%. This leaves a 2.1% disparity in the 1967 mailing and a 6.5% disparity in the 1966 mailing. It must be noted that the voter registration list also includes persons not qualified for jury service because they are over 74 years of age and persons exempt from jury service because of their occupation. The court therefore finds this disparity insufficient to infer discrimination.
Additional evidence was introduced which indicates that the petit jury master lists contained an average of approximately 20.3% residents of Newark after mailing. Defendants contend this under-representation is the result of using the voter registration lists as a source of names since the percentage of Newark residents registered to vote is less than the percentage of Newark residents in the general population. The court finds this argument without merit. Those who fail to register to vote in this county eliminate themselves from jury service. See: Hearings before the Subcommittee on Improvements in Judicial Machinery of the Committee on the Judiciary United States Senate, 19th Cong., 1st. Sess. 43 (1967). Recently the Federal Government passed into law the Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861 et seq. This federal statute approves the use of the voter registration lists as the source of names for jury service and indicates it is the most effective means of obtaining juries which reflect a fair cross-section of the community. This court agrees with the policy expressed in the federal statute and holds that the use of the voter registration lists as a source of names for jury service is a valid *356 method of preparing jury lists, even though qualified members of a particular class of persons are under-represented on the voter registration lists.
This court now turns to the question of the alleged disparity between the number of Negroes qualified for jury service and those actually on the petit jury master lists. A sample from the petit jury master lists of May 1966 to May 1967 was taken by selecting every 16th name and then personally interviewing the juror to determine his or her race. The sample totalled 299 names out of a universe on the four lists of approximately 18,000 names. The result of this sample showed 8.36% to be Negro. There was no evidence introduced to the court which indicates the number of qualified Negroes registered to vote in Essex County. Therefore, this court is without sufficient evidence to determine if a significant disparity exists between the number of Negroes qualified for jury service and the number of Negroes who actually served on the petit jury. As indicated heretofore, Negroes comprise 17% of the general population of Essex County between the ages of 21 to 74 years. When comparing this figure of 17% with the result of the sample (8.36%), one finds a disparity of 8.64%. This court cannot conclude that this disparity is the result of a systematic and deliberate exclusion of Negroes. There is the strong probability that this segment of the Negro population is not qualified for jury service, or is exempt from jury service, or has simply failed to register to vote. This court therefore concludes that defendants have failed to establish a prima facie case of jury discrimination against Negroes in the case at bar.
The aforesaid reasoning applies equally to the question of whether there is a significant disparity between the percentage of persons of lower economic status qualified for jury service and persons of that group who actually serve on jury duty. Again, defendants failed to introduce in evidence statistics which indicate the percentage of persons of lower economic status who are qualified for jury service or who are registered to vote in this county. Therefore this court concludes *357 that the defendants' statistics do not prove a policy or "formal method" of total and systematic exclusion of persons of lower economic status. See Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947). In addition, the case at bar differs materially from Labat v. Bennett, 365 F.2d 698 (5 Cir. 1966), cited with emphasis by defendants. In Labat the Court found that there was a policy of "systematic total exclusion of daily wage earners as a class." (at p. 721). In the instant case there was significant representation of persons of lower economic status on the petit jury master lists. Therefore, this Court finds that defendants have failed to show a systematic or deliberate exclusion of persons of lower economic status from petit jury service.
In conclusion, defendants' motions to dismiss the indictments herein are denied.
NOTES
[1] Questionnaires are mailed a year in advance to preparing the petit jury master lists for a particular term of court. Following is a schedule of the 1965 and 1966 total mailings, which names were used to compose the 1966 and 1967 petit jury master lists:

 1965 for 1966 1966 for 1967
 Municipality Male Female Total Male Female Total
 Belleville ....... 685 193 878 1141 283 1424
 Bloomfield ....... 881 396 1277 1536 644 2180
 Caldwell ......... 226 110 336 268 125 393
 Cedar Grove ...... 399 68 467 457 114 571
 East Orange ...... 1530 522 2052 2249 852 3101
 Essex Fells ...... 102 77 179 135 89 224
 Fairfield ........ 134 20 154 201 29 230
 Glen Ridge ....... 227 140 367 352 184 536
 Irvington ........ 1427 422 1849 2132 421 2553
 Livingston ....... 927 132 1059 850 399 1249
 Maplewood ........ 888 354 1242 989 396 1385
 Millburn ......... 657 254 911 864 264 1128
 Montclair ........ 717 400 1117 927 442 1369
 Newark ........... 5163 1625 6788 8728 2887 11615
 North Caldwell ... 156 47 203 194 44 238
 Nutley ........... 755 254 1009 935 354 1289
 Orange ........... 575 190 765 1236 474 1710
 Roseland ......... 113 68 181 171 50 221
 South Orange ..... 507 301 808 610 338 948
 Verona ........... 528 169 697 614 159 773
 West Caldwell .... 308 114 422 421 133 554
 West Orange ...... 906 379 1285 1406 603 2009

[2] See footnote 1, supra.
[3] The total number of registered voters in Essex County for 1967 was 402,536. Newark had 133,964 registered voters, whereas the total number of registered voters in the suburbs was 268,572. Thus, suburban registered voters outnumber Newark voters by approximately a 2 to 1 ratio. (It is also interesting to note that the Central Ward of Newark had the least amount of registered voters when compared to the other wards in the city).